Pierre G. Lundberg, J.
Through their respective attorneys and by various notices of motions defendants collectively, as to all the above-mentioned various indictments, seek a variety of relief. This memorandum decision deals solely with defendants ’ motions to dismiss all indictments pursuant to GPL 210.20 (subd. 1, par. [c]) and subdivision 5 of CPL 210.35. To distinguish this from other decisions simultaneously decided, I denominate this as the Defective Proceeding Decision.
BACKGROUND
By appropriate resolution adopted on April 28, 1969, the former Board of Supervisors acting pursuant to the Suffolk County Improvement Act authorized the condemnation of certain properties in the Town of Southampton, Suffolk County, New York, bounded generally by the Atlantic Ocean on the south and Shinnecock Bay on the north. The initial capital budget authorization of September 23, 1968, for this acquisition was $3,025,000. Approximately 35 parcels were involved and during the proceedings a claim was filed by the Town of Southampton to all lands on the ocean side between the top of the dunes and mean high water mark of the ocean; a similar claim was filed on the bay side by the Trustees of the Freeholders and Commonalty of the Town of Southampton to all lands below mean high water mark on the bay. The Town of Southampton claimed a public easement on the ocean side, whereas by virtue of the Dongan Patent the Trustees ’ claim was to the fee title of the lands below the mean high water mark.
The same attorneys represented both the town and the trustees, although each is a separate body politic. In like manner, these same claimants through the same attorneys were simultaneously asserting similar claims of title to properties lying just to the west of the taking and those claims were then being actively litigated in the Supreme Court, Suffolk County.
*524 In the month of June 1971, the County Legislature, successor to the Board of Supervisors, at the request of the County Attorney increased the capital budget appropriation to $7,500,000. Later in the month of June, 1971, the County Attorney presumably acting under the provisions of the Suffolk County Improvement Act as revised by chapter 435 of the Laws of 1969 and Resolution No. 340 of the Board of Supervisors adopted June 9,1969, settled the remaining claims, excluding the Jemkap Parcels (the McCarthy claim having been settled in 1970), for a total payment of $7,000,000. No payment was made to the town or the trustees; it would appear as a matter of law that their claims are still in existence.
On December 29, 1971, Mr. Justice Geiler in Dolphin Lane Assoc, v. Town of Southampton (72 Misc 2d 868) approved a radically new way of determining mean high water mark on the bay side which when applied to the taking map substantially increased the acreage under water to which the trustees claimed fee title. (As of this date, there has been no appellate decision approving or disapproving the Dolphin Lane determination.)
In December, 1971, the District Attorney commenced an investigation into this condemnation proceeding popularly and hereafter referred to as “ Barrier Beach ”. In July, 1972 testimony was presented to the Grand Jury then sitting, and its term was variously extended to December 15, 1972.
On December 8, 1972, the Grand Jury returned these indictments and on December 15, 1972, it returned a report pursuant to CPL 190.85 (subd. 1, par. [c]). It befell my lot to have to read the nearly 2,800 pages of Grand Jury minutes and 112 exhibits in connection with the report. As a matter of judicial economy and without apparent objection of the parties, all motions in relation to the indictments have been made before me.
The defendant, Percy, is.the County Attorney; Cameron was the, then, Supervisor of the Town of Southampton; R. Thomas Strong is a member of the County Legislature and at the time a member of its finance and budget committee; John Strong is a real estate broker, a brother of R. Thomas Strong, and the person who effected the total $7,000,000 settlement with the County Attorney on behalf of the claimants, some of whom paid him a fee and some of whom did not. Since the commencement of the Grand Jury proceedings John Strong has publicly stated that he received commissions of $500,000.
Collectively, the indictments contain: 2 counts of grand larceny, second degree, 13 counts of perjury, first degree, 6 counts of official misconduct, 2 counts of receiving reward for official *525 misconduct, 2 counts of rewarding official misconduct, 1 count of receiving unlawful gratuities, and 1 count of giving unlawful gratuities.
THE COUNTY’S APPRAISAL PROCEEDINGS
The County Attorney employs an independent appraiser to evaluate the property taken by condemnation; a written contract agreement is entered into between the parties. At the time of these proceedings, the County Attorney’s office had a Senior Review Appraiser who co-ordinated all appraisals and consulted with the independent appraisers, Assistant County Attorneys, employees of the Department of Public Works involved with county condemnations and regularly with the County Attorney. William R. Lockwood, a former State employee, held this position; one of his functions was to criticize the manner in which an appraisal was done. As per procedure, the independent appraisals are always denominated “ preliminary ”. In this case four preliminary appraisals were submitted. “ Preliminary I ” discussed the problems presented but ascribed no total or individual parcel valuations (although a formula is set forth from which one can project such values).
‘ ‘ Preliminary II ’ ’ had both individual parcel and a total valuation — the total being $5,722,225, excluding Parcels 34 and 35 (Jemkap).
Lockwood was vigorously critical of the manner in which “ Preliminary II ” determined site improvement costs on the bay side, contending they should be much higher. He recommended and obtained the County Attorney’s approval for him to obtain an engineering study. ‘ ‘ Preliminary III ’ ’ applied this engineering study to the property of only 3 claimants being 8 of the 35 parcels. Using this basic information and applying the mathematics to all the bayside property (except for Parcel 31 there was no change in “ II ” and “ III ” as to ocean frontage value), Lockwood compiled figures for each of the parcels total-ling $4,422,475 including parcels 34 and 35. Using almost identically Lockwood’s figures, offers were made by the Department of Public Works to all claimants in September, 1970. (McCarthy, the only one to accept, will be separately discussed.)
“ Preliminary IV ” was submitted June 4, 1971; it maintains the same formula for the bay side as in “Preliminary III” with some adjustment, but increases ocean value from $400 a front foot to $500 a front foot with appropriate modifications upwards and downwards. The increase in ocean value is attributed partially to allegedly comparable sales and to a significant *526 difference in the interpretation of the Town of Southampton Zoning Ordinance applicable to these parcels. At the time of “ Preliminary II ”, officials of the town advised that four units an acre was the building limit; this was subsequently revised to 16 units an acre and made garden apartments feasible. ‘ ‘ Preliminary IV ” had a total value of $6,083,500.
The prevailing rule of thumb in the County Attorney’s office as to exposure-or-risk-in-court proceedings was 10% to 15% over the county’s appraisal.
REASON FOR THESE MOTIONS
The parties substantially make these motions by virtue of assumptions they have made due to requests made by me to the People when all the parties were before me on January 31,1973, on motions such as for discovery and to dismiss the indictments for insufficiency of evidence before the Grand Jury (those motions will be determined by separate decisions).
This Grand Jury had originally been instructed by me — as are all Grand Juries in this county by all the Judges of this court since September 1, 1971 — that any legal instructions or advice from the court or from the District Attorney must be recorded in their minutes as required by subdivision 6 of CPL 190.25.
By January 31, 1973, in connection with reading the minutes ás to the Grand Jury report, I was aware that on August 3, 1972, the foreman asked the People for legal advice. He received a two-sentence answer and by direction the balance of discussion was off the record. On and before that date I was also intrigued with the legal theories of the indictments, some of which seem to be in conflict. One theory being that the defendants caused the county to pay too much money; the other, as to the McCarthy parcel, being that the county had not paid enough money. I further knew that there was no explanation of this in the minutes provided to me and, accordingly, made my request for additional information or minutes.
Subsequent thereto the People provided me with additional minutes of December 8, 1972, which are of a nontestimonial nature. They have further advised me that the Grand Jury was legally instructed by them on November 2,1972 and November 17, 1972 and December 8, 1972. Except for December 8, 1972, there are no minutes available.
On November 2, 1972, the jury heard one witness whose testimony is 10 pages long; for November 17, 1972, I am in possession of no testimonial minutes.
*527 THE MOTIONS THEMSELVES
Defendants ask that all the indictments be dismissed, on the ground that the Grand Jury proceeding was defective within the meaning of subdivision 5 of CPL 210.35 which reads as follows: “ 5. The proceeding otherwise fails to conform to the requirements of article one hundred ninety to such degree that the integrity thereof is impaired and prejudice to the defendant may result.”
For the various grounds hereafter set forth, the motions are in all respects granted; each indictment and each count thereof is hereby dismissed.
I FAILURE TO RECORD LEGAL INSTRUCTIONS
I believe this to be a first impression determination as to the requirements of subdivision 6 of CPL 190.25, which reads as follows: “ 6. The legal advisors of the grand jury are the court and the district attorney, and the grand jury may not seek or receive legal advice from any other source. Where necessary or appropriate, the court or the district attorney, or both, must instruct the grand jury concerning the law with respect to its duties or any matter before it, and such instructions must be recorded in the minutes. ” (Emphasis mine.)
The underlined portion was newly added by the Criminal Procedure Law and did not exist in the Code of Criminal Procedure’s counterpart section 255. Citing various revisors ’ notes, each party claims the requirement is for his benefit. Without full elaboration of the contentions and mindful that same is not the Federal rule, where no explicit statutory requirement exists (United States v. Peden, 472 F. 2d 583), I hold that “ must ” means must and that the failure to record instructions on August 3, 1972, November 2, 1972 and November 17, 1972, vitiates the entire Grand Jury proceedings (cf. Matter of D’Addario v. McNab, 41 A D 2d 677).
I believe an appellate review of this decision will be of help to the Bench and Bar.
I am aware of the 30-day limitation imposed on making this motion, subdivision 2 of CPL 210.20, effective May 1, 1972. Under the facts, I entertain the motion in the interest of justice and for good cause shown.
By separate decision denominated ‘ ‘ The Insufficiency of Evidence Decision ”, I am going to assume that the failure to record in the minutes, as well as the cumulative errors set forth in “ II ” hereof (infra), are insufficient grounds to dismiss the indictments. As applicable, I fully incorporate that decision herein. As will be seen by reference thereto, I indulge in speculation and *528 conjecture in relation to the indictments or separate counts sustained or dismissed. If the legal instructions were available to. me, I would not have to engage in speculation and conjecture; neither the People nor the defendants nor the court should be put in such a position on a motion to review the sufficiency of the minutes.
The People have submitted an extensive memorandum in opposition to these motions; I have considered each of their contentions. It is difficult not to comment on Point Three. I consider this an argument unworthy to be advanced by the office of the District Attorney of this county. I should also like to mention that, pursuant to a temporary assignment to Rockland County, I was provided with both instructions and testimony in reviewing the Grand Jury minutes of the case to which I am assigned. I expect, if things have been withheld from me heretofore in this county, that henceforth I shall receive full and complete minutes.
II CUMULATIVE ERRORS IMPAIRING THE INTEGRITY OP THE PROCEEDING
Assuming, standing alone, the failure to record legal instructions in the minutes does not invalidate these indictments, which for appellate review purposes I have determined to be a sufficient ground, I dismiss the indictments for cumulative errors in the proceeding. These are as follows:
1. The failure to record in the minutes instructions given to the jury by the People on August 3, 1972, November 2, 1972 and November 17, 1972.
2. Errors made and assumed in the proceeding relating to Parcels 20 and 21, to be discussed separately, infra.
3. Errors made and assumed in the proceeding relating to the “ McCarthy ” parcel, to be discussed separately, infra.
4. Testimony contained at pages 55 to 66 in transcript of proceedings on September 7, 1972, discussed, infra, as “Hearsay Testimony ’ \
5. On November 2, 1972, a witness testified from two charts not offered in evidence. Without the charts, it is impossible to ascertain accurately from the transcript what was the testimony of the witness.
6. The instructions and requests as set forth in the non-testimonial minutes of December 8, 1972.
7. Except for the nontestimonial minutes of December 8, 1972, there is no mention in the minutes of any figure of $10,000 relating to any transactions between John Strong and Robert Cameron. Those minutes of December 8, however, contain state *529 ments from which one can readily imply that somewhere a $10,000 figure was discussed or there was testimony given, neither of which was recorded in the minutes.
8. On July 17, 1972, a witness testified and read to the jury from four separate documents none of which was recorded by the stenographer. On December 12, 1972, after the handing up of the indictments, an Associate Assistant District Attorney purported to offer in evidence, before only the acting foreman, Exhibits 109, 110, 111 and 112 allegedly being the four documents used by the witness on July 17, 1972. (Standing alone I would view this as harmless error but on the entire record I assign it as a cumulative fatal error.)
PARCEL 20 AND 21
In 1966 this parcel was purchased for $350,000 — all cash. The settlement in condemnation in 1971 was $960,000. The original purchase was initially a corporate venture of two parties with one individual putting up the entire purchase price; he put up $50,000 of his own funds and borrowed $300,000 from a bank secured by collateral. Interest was paid by him throughout to the bank; the joint venture agreement provided that he be repaid his $350,000, plus all interest and other expenses and thereafter all profits would be divided evenly. The noncontributing party was to be recompensed for having brought the purchase opportunity to the contributor. To protect the contributor, he was given by the corporation a noninterest nonamortizing purchase-money mortgage of $350,000 payable at the end of five years.
Testimony concerning this acquisition was given to the Grand Jury on August 3, 1972. While referred to briefly in the testimony of the contributor, the purchase-money mortgage asp,ect of the transaction was not otherwise discussed, and at that point, it was not particularly material to the investigation.
The county’s Senior Review Appraiser, William R. Lockwood, appeared before the Grand Jury on July 18, 20, 24, 26, September 14, 19 and October 18, 1972. Exhibit 19 is his personal file concerning ‘‘ Barrier Beach”; among other items it contains detailed memoranda of numerous conferences had with Percy, John Strong, the appraiser, and the engineers. He testified substantially and with confidence from those memoranda. To put it mildly, he was a very positive witness.
His memoranda and testimony indicate that at various times John Strong was primarily interested in the settlement of those two parcels. This is discussed substantially in a memorandum dated November 30, 1970, which in part states as follows: “ I *530 in turn pointed out to him [Percy] that the owner of Parcels 20 and 21 acquired title to this property approximately three years before we vested title. They paid $350,000.00 for it, subject to a full mortgage of $350,000.00 no cash transaction, plus no interest for a period of five years which would not expire until the summer of 1971. I further pointed out that we made a partial payment in the amount of $388,000.00 and the County had already paid off this mortgage, so that the owners of the property were free and clear. I then advised Mr. Percy that we had already offered $547,000.00 in full settlement which was a cold profit of $200,000.00 on this property which was gained in slightly over three years and in my opinion was just compensation. He had to agree that there was some merit to our analysis and concluded that the judge would certainly take this into consideration. Our value is based upon $390.00 per front foot less development costs. In effect, the owners of this property are not satisfied with a $200,000 profit for no investment for three years; he [John Strong] wanted $400,000.00.”
On October 18, 1972, two and a-half months after the Grand Jury heard testimony of the actual transaction,. Lockwood testified extensively before the Grand Jury and at pages 80 to 83 substantially repeated to the jury what is contained in his memorandum, perpetuating his error that the property was purchased for no money down “ and this one to me this is like a big red flag waving ”.
If all stopped there, Lockwood’s error might not be grievous, but the minutes reveal that the prosecutor adopted Lockwood’s testimony or memorandum as being what actually occurred. Numerous questions were put to various witnesses assuming that a transaction took place where no money was put down, no interest was paid and thereafter a “ cold profit ” of $610,000 was realized. The minutes reveal that individual members of the jury were not loathe to question witnesses, but nowhere in the minutes was this error corrected.
I am of the opinion that neither Lockwood nor the prosecutor made the error intentionally; I am of the opinion that the error made by both men was inflammatory and prejudicial to the defendants.
THE MCCABTHY PABCEL
These are Parcels 12 and 13 in the taking, owned by Ethel McCarthy since 1918. No other parcel in the taking was owned by a claimant prior to 1959. Other than McCarthy, the minutes describe the claimants as “ raw acreage men ”. The indictments and the minutes depict McCarthy as the “ little old lady ” who *531 was fleeced. Fleeced she may have been but not by any of these defendants.
Following the receipt of “ Preliminary II ”, it was determined to make partial payments to all claimants to curtail the running of interest. The values set forth in “ Preliminary II ” were arbitrarily reduced 20%, and 60% of that reduced figure was paid to the claimants. The 20% reduction was determined after considering Lockwood’s strong recommendation that there be a reduction in the value of the bay side parcels, together with the appraiser’s recommendation that a “ cash discount ” should be available since his appraisals and evaluations were based on terms being available rather than cash purchases.
“Preliminary II” tentatively valued Parcels 12 and 13 at $132,000 or a reduced value of $105,600. The 60% payment was rounded off to $60,000 plus accrued interest of $2,610.00 which was paid on or about May'13, 1970.
By letter dated September 24, 1970, an official of the Department of Public Works, presumably working from the Lockwood projection of “ Preliminary III ” (see Exhibit 105 and the last page attached to “Preliminary III” as contained in Exhibit 93) wrote to Mrs. McCarthy’s attorney stating that the parcels were evaluated at $56,000 and offering to settle at that figure.
Her attorney wrote to the Department of Public Works on September 28,1970, seeking assistance as to how he could determine if $56,000 was a fair offer, to which he received a reply dated October 1, 1970. By October 9, 1970, counsel bestirred himself enough to inquire why if the property was only worth $56,000, four months earlier his client had received $60,000. This produced a Department of Public Works reply dated October 19, 1970 stating that, subsequent to the preliminary payment, engineering studies reduced the value of the bay parcel. TheJreply suggested that Mrs. McCarthy might be required to refund $4,000 and implied that the admonition of Matthew, as quoted by Mr. Justice Wingate ‘ ‘ Agree with thine adversary quickly, whiles thou art in the way with him ’ ’. Matter of Rosenblatts (167 Misc. 258, 262) might be a judicious course of conduct.
Counsel lost no time and by reply mail of October 20 agreed to accept the $60,000 in full settlement.
The Grand Jury minutes and the record, Exhibit 84, show clearly that this parcel was settled exclusively by a Senior Right of Way Agent on behalf of the county, that Lockwood approved the settlement agreement, and that Percy signed same at a time when the county was evaluating the property at $56,000.
By the fourth count of Indictment 910C-72, defendant Percy is charged with official misconduct for failure to pay just com *532 pensation as to Parcels 12 and 13 based on submitted appraisal figures. Count 11 of Indictment 910G--72 charges him with perjury, premised again on the theory that at the time of settlement the county’s appraised value figure was $132,000 and not $56,000. Assuming, that by being the ultimate signatory to the settlement agreement, Percy bears responsibility, it is amply clear that the minutes nowhere reveal the awareness by the jury of the existence of the $56,000 figure and offer.
As set forth in Indictment 910G-72, Percy testified as to his policy of payment in condemnation and his instructions to his subordinates in this respect that the county should offer, as a minimum, the county appraisal and that as of July, 1971 the State Legislature mandated such to be the minimum payment (L. 1971, ch. 1161).
I do not know, from the minutes, if the Grand Jury was made aware of the contents of chapter 1161 of the Laws of 1971, but it clearly states: “ and [if] the amount of the claim for legal damages caused by such acquisition cannot be agreed upon, the condemnor shall offer to pay to the property owner the full amount determined by the condemnor to be the value of such claim for legal damages.” (My emphasis and insert.)
Clearly it cannot be a crime to violate a personal policy, and even under the above statute the parties are free to agree upon the legal damages whether the agreement be wise or unwise on the part of the claimant.
The failure to present or understand the factual basis for the McCarthy settlement permeates the proceeding — continually McCarthy is referred to as a “ comparable sale” — and is another cumulative error rendering the proceeding defective.
HEARSAY TESTIMONY
This testimony was knowingly presented and was not inadvertent. Except for those exceptions set forth in subdivision 2 of CPL 190.30, the rules of evidence applicable before a Grand Jury are the same as at trial (CPL 190.30, subd. 1); and the District Attorney should make rulings as to admissibility (CPL 190.30, subd. 3), and instruct as to the significance, legal effect or evaluation (CPL 190.30, subd. 4) where a court would be required to so do at a trial.
There are no recorded instructions with respect to this testimony. The witness was presented only for this purpose and was permitted to testify to an alleged conversation he had with John Strong which conversation occurred in December, 1971, nearly six months after the settlement of the Barrier Beach *533 claims. The conversation concerned a different and prospective taking by the county.
The witness was permitted to testify that John Strong attempted to have the witness retain his services in settling any claims by direct purchase by the county because of his rare eminent knowledge of property value, and that he and his family were long-time residents of the county. The witness testified three times that John Strong stated that his family connection with R. Thomas Strong, a County Legislator, would have nothing to do with the results he could produce but that only his personal knowledge and skills were involved.
As hearsay the testimony was inadmissible for the truth of what was allegedly said; if offered only to prove that John Strong made the statements attributed to him by the witness, it is a question of relevancy and limiting instructions are required (see and cf. People v. Rosati, 39 A D 2d 592).
The testimony is not relevant under People v. Molineux (168 N. Y. 264) or other similar eases. It was not admissible under any exception to the hearsay rule nor as an admission since the content was consistent with innocence.
The innuendo contained in the testimony is patent. It was directly inflammatory as to the defendants Strong and vicariously so as to the other defendants.
It is certainly true that the presentation of this testimony violated no constitutional rights of these defendants (Matter of Miranda v. Isseks, 41 A D 2d 176) but the People violated the statutory commands of the Legislature, and this was a calculated violation comparable to that condemned in People v. Rodriguez (28 Misc 2d 310). It cannot be said that this is a situation where the receipt of illegal evidence before a Grand Jury can be ignored (People v. Sexton, 187 N. Y. 495).
Submit separate orders as to each indictment dismissing same. After a review of this and the “insufficiency decision”, the People may apply, on notice to the attorneys for the defendants, for leave to resubmit immediately or, if necessary, following any appeal. It is not clear whether an appellate court can grant leave to resubmit or whether this court can do so following an appeal or only prior to an appeal. This is respectfully called to the attention of the parties to avoid any technical impediment to the right of the People to resubmit by failure to make timely application.