COURT OF APPEALS,

January, 1915.

# THE PEOPLE v. WILLIAM WILLETT.

(213 N. Y. 368.)

(1.) INDICTMENT—MOTION TO DISMISS FOR INSUFFICIENCY WHEN WAIVED.
  Unless a motion founded upon the indictment and the insufficiency thereof is made before or at the time when the defendant is called for judgment, the objections thereto are waived. (Code Crim. Pro. §§ 323, 331, 467, 469.) Motions to set aside the verdict and for a new trial upon the ground that it is against the law, or for an arrest of judgment upon the ground that the grand jury and the court had no jurisdiction of the offense, for the reason that the acts did not take place in the county of Kings, do not raise that question. Such a ground of objection should be specifically called to the attention of the court.

(2.) SAME—PENAL LAW, SEC 751—PURCHASE OF NOMINATION FOR PUBLIC OFFICE.
  Section 751 of the Penal Law seeks to prevent corrupt bargaining to induce a particular voter or number of voters to vote in a particular manner and has reference wholly to individual action. Section 775 includes and seeks to prevent corrupt bargaining by a person in a position or exercising authority which can be used to influence a party convention as a body and thus bring about a nomination.

(3.) SAME—PENAL LAW, SEC. 775.
  A person in a position or having authority, official or otherwise, by influence or otherwise, to procure or cause a nomination to public office, who, for a price, offers to procure or cause such nomination to office by a public officer or through a nomination by a political convention, and the person who requests such nomination and offers to pay the price "is any person" within the meaning of section 775 of the Penal Law.

(4.) SAME—GUILTY CONSCIOUSNESS MAY BE INFERRED.

When a person is publicly accused of crime, or is accused by formal criminal proceedings, a guilty consciousness may always be inferred from falsehood, misrepresentation, evasion, equivocation or by suppression of the facts in regard to the same.

(5.) SAME—WHERE EVIDENCE TO PROVE COMMISSION OF SUCH CRIME PROPERLY RECEIVED, AND SUFFICIENT TO SUSTAIN VERDICT CONVICTING DEFENDANT OF CRIME CHARGED.

Defendant was on trial for " the crime of requesting and accepting a nomination for a public office, upon the understanding and promise of a valuable consideration, and upon the payment of a valuable consideration." While defendant and two others were candidates for justice of the Supreme Court an editorial was published in a newspaper referring, among other things, to one of the nominations as a " shocking scandal." The three candidates met and discussed the editorial, and statements were made by each of them as to what could be said as to his connection with the nomination. Thereupon a criminal proceeding was commenced against the newspaper which published the editorial, for which purpose defendant and the other nominees made affidavits. Defendant's affidavit contained extracts from the editorial, a copy of which was attached to the affidavit. Following an admission by the defendant that he had borrowed money before his nomination and of some facts connected therewith, the proceeding for criminal libel was withdrawn. The two candidates other than defendant then each published a personal statement, and following such personal statements the defendant published a statement in which he referred to the statements of the two other candidates. The editorial, the affidavits and the statements to the press by the defendant's associates were objected to. *Held*, that the papers and statements were properly received, not as evidence of the facts contained therein, but from which to determine in connection with other evidence whether the defendant by concealing information, and by partial statements, equivocation, and by untruthfulness, evidenced consciousness of guilt, the court having so limited their effect in the charge to the jury.

(6.) SAME.

The defendant, in his published statement, stated that he had used some of the money he had recently borrowed to take up a note. Testimony was given by the People to show that the defendant's brother took up this note with his own money. *Held*, that the evidence so given was proper, as tending to disprove the de-

fendant's statement that he took up such note with a part of the money so borrowed by him.

*People* v. *Willett*, 164 App. Div. 1, affirmed.

APPEAL from an order of the Appellate Division of the Supreme Court in the second judicial department, entered October 2, 1914, which affirmed a judgment rendered at a Trial Term for the county of Kings upon a verdict convicting the defendant of the crime of requesting and accepting a nomination for a public office upon the understanding and promise of a valuable consideration and upon the payment of a valuable consideration.

The defendant was indicted in Kings county by indictment as follows: " The grand jury of the County of Kings by this indictment accuse William Willett of the crime of requesting and accepting a nomination for a public office upon the understanding and promise of a valuable consideration and upon the payment. of a valuable consideration committed as follows:

" The defendant above named prior to October 7, 1911, did request one Joseph Cassidy and one Louis T. Walter, Jr., to procure for him from the Democratic Judicial Convention of the Second Judicial Department of the State of New York to be held on or about the 6th day of October, 1911, his nomination as a candidate for the office of Justice of the Supreme Court of the State of New York and said office being a public office, to be voted for at the election to be held in said Judicial District on November 7, 1911, and to cause him to be nominated therefor and did promise to pay and contribute and did pay and contribute therefor to them the said Cassidy and Walter a valuable consideration to wit a sum of money the exact amount of which is unknown to this Grand Jury and the said Cassidy and Walter thereupon promised in consideration thereof to procure such nomination for the defendant.

" On October 6, 1911, in the County of Kings there was held

the regular Democratic Judicial Convention of the Second Judicial District, the same being a convention duly and regularly held for the purpose of selecting and nominating three candidates for the office of Justice of the Supreme Court according to the law of the State of New York and the rules of said Democratic party in said state. The said Walter was a delegate to said convention and did there offer in nomination said defendant as a candidate for said public office and did vote for him therefor in return for the promise and payment of such valuable consideration by defendant to said Cassidy and Walter as aforesaid. The said defendant was nominated by said convention as a candidate for Justice of the Supreme Court of the state of New York and the said defendant thereafter accepted such nomination in said County of Kings on October 6, 1911.

" The said nomination was caused and procured by said Cassidy and Walter upon and in return for the promise and payment by defendant to them of said consideration aforesaid and by their influencing and inducing delegates to said convention to vote for said defendant for said nomination and by other means exerted by them to this Grand Jury unknown.

" JAMES C. CROPSEY,<br>" <em>District Attorney.</em>"

Joseph Cassidy, referred to in the indictment, was at all the times mentioned therein the chairman of the Democratic general committee in the county of Queens; Louis T. Walter, Jr., referred to in the indictment, was at all times mentioned therein an intimate friend of Cassidy, and for fifteen years had been a client and intimate friend of the defendant.

The second judicial district is composed of several counties, including the counties of Kings and Queens, and each assembly district in said judicial district is entitled to be represented in the judicial convention mentioned by one delegate. Cassidy,

Walter and the defendant were each residents of the county of Queens, and Walter was a delegate to said judicial convention from one of the assembly districts of said county. Other facts appear in the opinion.

*Robert H. Elder* for appellant.

The indictment does not state facts sufficient to constitute a cause of action; it alleges no crime to have been committed within the jurisdiction of the grand jury; and the proof showed no criminal act to have been committed. The pleader evidently conceived that subdivision 3 of section 775 of the Penal Law applied to the facts of this case, and he pleaded the facts in an attempt to bring them under this law, but the pleading was insufficient in that it does not set forth any crime of "making, tendering or offering to procure, or cause any nomination" within the meaning of the statute, or "any payment or contribution of a valuable consideration, or any understanding or promise thereof" as contemplated by statute. (Penal Law, § 775, subd. 3; L. 1892, ch. 693; L. 1881, ch. 676; L. 1890, ch. 94, § 1; L. 1892, ch. 693, § 1; L. 1895, ch. 721, § 1; L. 1897, ch. 255, § 1; L. 1898, ch. 197, § 1; L. 1899, ch. 530, § 1; L. 1905, ch. 625, §§ 1, 2; L. 1901, ch. 375, § 1.) A newspaper editorial entitled "Tammany's Tainted Touch on a Judiciary Ticket," charging a corrupt bargain by which defendant was nominated, and was to be elected, and the payment by defendant of a large sum of money in pursuance of such bargain, and containing a denunciation of defendant, was admitted in evidence against him, under circumstances that were very prejudicial to him, although it was irrelevant and incompetent, and objected and excepted to by him. (People v. Koerner, 154 N. Y. 355; People v. Kennedy, 164 N. Y. 449; Wigmore on Ev. § 1072 (4); Chamberlayne's Mod. Law Ev. § 1418, n. 5; Fitzgerald v. Williams, 148 Mass. 462; Commonwealth v. Johnson,

213 Penn. St. 607; People v. Teshara, 134 Cal. 542; People v. Morton, 139 Cal. 719; O'Hearn v. State, 79 Neb. 513; State v. Richardson, 194 Mo. 326; Brown v. State, 78 Miss. 637; Ware v. State, 96 Ga. 349; Phelan v. State, 114 Tenn. 483; Low v. State, 108 Tenn. 127; Kendrick v. State, 9 Humph.. [Tenn.] 72; Deathridge v. State, 1 Sneed [Tenn.], 75.)

*James C. Cropsey, District Attorney (Hersey Egginton* and *Ralph E. Hemstreet* of counsel), for respondent.

Neither the sufficiency of the facts nor that of the indictment is now open to review in this court. (People v. Bright, 203 N. Y. 73; People v. Sheffield Farms-Slawson-Decker Co., 206 N. Y. 79; People v. Lambrix, 204 N. Y. 261.) The indictment herein accuses the appellant of the crime " of requesting and accepting a nomination for a public office upon the understanding and promise of a valuable consideration." This was charged and proved to have taken place in Kings county, and constitutes the offense defined by section 775, subdivision 3, of the Penal Law, even if the person to whom the request was made, and who procured the nomination, had no official place and exercised no official authority. (People v. K. C. I. Foundry, 209 N. Y. 207; Phelps v. People, 72 N. Y. 334; People v. Williams, 92 Hun, 354; Reg. v. Brisac, 4 East, 164; People v. Summerfield, 48 Misc. Rep. 242; People v. Peckens, 153 N. Y. 576; People v. Dimick, 107 N. Y. 13; People v. Mitchell, 49 App. Div. 531; 168 N. Y. 604.) The editorial in the Standard-Union was properly admitted in evidence with the limitations that were carefully prescribed by the presiding justice. (Wigmore on Ev. §§ 266, 273, 278; Wharton's Crim. Ev. [11th ed.] §§ 683, 683a; Underhill's Crim. Ev. [2d ed.] § 116; People v. Arnold, 43 Mich. 303; State v. Robinson, 117 Mo. 649; People v. Wilkinson, 14 N. Y. Supp. 827; People v. Conroy, 97 N. Y. 62; State v. Benner, 64 N. Y. 267; Cole-

man v. People, 58 Maine, 555; Wilson v. United States, 162 U. S. 613; Commonwealth v. Devaney, 182 Mass. 33; Hinshaw v. State, 147 Ind. 334; Walker v. State, 49 Ala. 398; State v. Bishop, 98 N. H. 773; Smith v. State, 29 Fla. 408; More v. People, 19 Col. 255; Commonwealth v. Godwin, 14 Gray, 55; Gilmour v. State, 126 Ala. 20.) The statements of Ketcham and Callahan were properly received in evidence. They were a part of the conversation with the defendant, and were read by him, and later he issued a statement in reply parts of which at least were untruthful.

CHASE, J.:

The unanimous affirmance of the judgment of conviction makes it unnecessary for us to consider the facts shown by the record, except so far as it may be necessary in the consideration of the alleged errors of law. The defendant now insists that the indictment does not state facts sufficient to constitute a crime.

The specific claim of the defendant is that the indictment is framed under section 775 of the Penal Law and that such section does not apply to a person who requests that he be nominated for office by a party convention and offers to pay and pays a valuable consideration to a political or party leader who is sufficiently influential among the delegates to actually control the action of the convention, and which party leader and one of the delegates offers to procure or cause the nomination on payment of such valuable consideration.

The defendant did not demur to the indictment or make any motion, objection to evidence, or request for instruction to the jury based upon the insufficiency of the indictment. The claim that a crime within the meaning of section 775 of the Penal Law was not charged in the indictment was apparently an afterthought.

It is now claimed by the defendant that the objection to the

sufficiency of the indictment should be considered by this court, because he made a motion to set aside the verdict and for a new trial upon the ground, among others, " That the verdict was against the law."   A motion was made for an arrest of judgment, but the only ground stated was: " That the grand jury of Kings county had no jurisdiction to find the indictment herein and the court did not have jurisdiction of the offense charged for the reason that the acts and the offense thereof did not take place in the county of Kings."   The motions in no way suggested that the indictment did not set forth facts sufficient to constitute a crime.   The sufficiency of the indictment was recognized, or at least assumed.   If it had been intended on the motion for a new trial or in arrest of judgment to raise the question of the sufficiency of the indictment, the attention of the court should have been specifically called to such claim. Unless a motion founded upon the indictment and the insufficiency thereof is made before or at the time when the defendant is called for judgment, the objections thereto are waived. (Code Criminal Procedure, sections 323, 331, 467, 469; People v. D'Argencour, 95 N. Y. 624; People v. Wiechers, 179 N. Y. 459; People v. Sheffield-Farms-Slawson-Decker Co., 206 N. Y. 79.)

The appeal was argued with the appeal in People v. Cassidy (213 N. Y. 388), decided herewith, in which the question whether the facts stated in the indictment constitute a crime is also raised.   As the question has been fully argued and must be determined in the decision of the appeals so argued, we will consider the question in this opinion.

We are of the opinion that the facts stated in the indictment do constitute a crime.

Penal laws defining crimes against the elective franchise have been enacted from time to time during our history and have increased in number during the last three or four decades.   They have not only increased in number, but have been modified and

developed to meet the public demand to effect, secure and enforce honesty in selecting persons for public office.

The Penal Code, enacted in 1881, contained a title (Title 5) headed "Crimes Against the Elective Franchise." It was in 1890 that a law was passed providing for an official ballot at the general elections and also for personal registration in cities. That title was also changed from time to time prior to 1892 and as it then existed, among many other things relating to the elective franchise, contained in substance the provisions now included in section 751 of the Penal Law. Prior to 1892 much had been said and written about the power wielded by political leaders, or so-called "bosses" in the state and in the subdivisions thereof. In the second edition of "The American Commonwealth" by James Bryce, which was issued in 1891, in discussing American politics and the power of individuals to control party nominations, he says: "There is usually some one person who holds more strings in his hand than do the others. Like them, he has worked himself up to power from small beginnings gradually extending the range of his influence over the mass of workers and knitting close bonds with influential men, outside as well as inside politics, perhaps with great financiers or railway magnates whom he can oblige and who can furnish him with funds. * * * He dispenses places, rewards the loyal, punishes the mutinous, concocts schemes, negotiates treaties. * * * Another useful expedient has been borrowed from European monarchies in the sale of nominations and occasionally of offices themselves. A person who seeks to be nominated as a candidate for one of the more important offices such as a judgeship or a seat in the state senate or in Congress, is often required to contribute to the election fund a sum proportioned to the importance of the place he seeks, the excuse given for the practice, being the cost of elections; and the same principle is occasionally applied to the

gift of non-elective offices, the right of appointing to which is vested in some official member of a Ring—*e. g.*, a mayor."

By chapter 693 of the Laws of 1892, title 5 of the Penal Code was generally amended and several sections were added, including section 41v, which was, except in punctuation, the same as section 775 of the present Penal Law.  It was enacted, as we have seen, after the criminality of bargaining for office to be obtained by the appointment or nomination of a public officer or through a nomination at a political convention had been generally discussed and called to public attention by the press, and at a time when such corrupt bargaining on the part of any person with power by reason of position or authority, official or otherwise, to make or control appointments or nominations, was quite universally condemned.  The legislature was attempting, as appears from the act of 1892, to prevent bargaining in offices.  The bargaining in offices especially condemned by public opinion was by persons not public officers.  Can it be that the legislature intended to so limit its statutory condemnation as to exclude from its provisions the bargaining specially condemned by the public?  Such intention should not be attributed to the legislature unless it so clearly appears by its enactments.

· Section 775 of the Penal Law should be read and construed in connection with the history of its enactment and the crimes sought to be restrained and punished thereby.  Section 775 is as follows:

" 775.  Corrupt use of position or authority.

" Any person who:

" 1.  While holding a public office, or being nominated or seeking a nomination or appointment therefor, corruptly uses or promises to use, directly or indirectly, any official authority or influence possessed or anticipated, in the way of conferring upon any person, or in order to secure, or aid any person in securing, any office or public employment, or any nomination,

confirmation, promotion or increase of salary, upon consideration that the vote or political influence or action of the person so to be benefited or of any other person, shall be given or used in behalf of any candidate, officer or party or upon any other corrupt condition or consideration; or

" 2.   Being a public officer or employee of the state or a political subdivision having, or claiming to have, any authority or influence affecting the nomination, public employment, confirmation, promotion, removal, or increase or decrease of salary of any public officer or employee, or promises or threatens to use, any such authority or influence, directly or indirectly to affect the vote or political action of any such public officer or employee, or on account of the vote or political action of such officer or employee; or

" 3.   Makes, tenders or offers to procure, or cause any nomination or appointment for any public office or place, or accepts or requests any such nomination or appointment, upon the payment or contribution of any valuable consideration, or upon an understanding or promise thereof; or

" 4.   Makes any gift, promise or contribution to any person, upon the condition or consideration of receiving an appointment or election to a public office or a position of public employment, or for receiving or retaining any such office or position, or promotion, privilege, increase of salary or compensation therein, or exemption from removal or discharge therefrom, Is punishable by imprisonment for not more than two years or by a fine of not more than three thousand dollars or both."

It is claimed by the defendant that the acts charged against him constitute a misdemeanor ·under subdivision 7 of section 751 of the Penal Law which with the first and last words of that section is as follows:

" Any person who    *    *    *

" 7.   Directly or indirectly, by himself or through any other

person, pays, or offers to pay, money or other valuable thing, or promises a place or position, or offers any other consideration or makes any other promise, to any person, to induce any voter to vote, ·or refrain from voting, at a political caucus, primary election, or convention, for or against any particular person; or does or offers to do, anything to hinder or delay any elector from taking part in or voting at, a political caucus, or at a primary election; * * *

" Is guilty of a misdemeanor."

It is urged that if the legislature has made the acts charged against the defendant a misdemeanor under said section 751, it would not intentionally have made the same acts a felony under said section 775.

The indictment does not allege that the defendant directly or indirectly paid or offered to pay money or other valuable thing to a person to induce any voter to vote for him at the convention except as it incidentally avers that Walter, as a delegate, did vote for the defendant in return for the valuable consideration promised and paid to Cassidy and Walter to procure such nomination for the defendant. That part of the indictment is simply an averment of acts in carrying out the agreement constituting the crime of requesting and accepting a nomination for a public office upon the understanding and promise of a valuable consideration and upon the payment of a valuable consideration as charged in the indictment.

Said section 751 is intended to punish a person who offers to pay money or other valuable thing to another person to induce a specific voter to vote or refrain from voting in a particular manner at a convention. It seeks to prevent corrupt bargaining to induce a particular voter or number of voters to vote in a particular manner. It has reference wholly to individual action and its meaning is made even more plain by reference to the other subdivisions of said section, particularly subdivisions 8 and 9 thereof.

It does not appear from the indictment or from the record that the defendant directly or indirectly offered to pay money to induce a person to vote for him. So far as appears no delegate to the convention (except perhaps Walter) sold his vote, and no one sought to purchase the vote of any particular delegate.

The acts charged in the indictment constitute bargaining for a nomination by a person in an official or other position or having official or other authority to bring about the selection of the person seeking a nomination. Section 751 relates to the detail of corrupt bargaining in connection with the elective franchise. Section 775 includes and seeks to prevent corrupt bargaining by a person in a position or exercising authority which can be used to influence a party convention as a body and thus bring about a nomination. Such bargaining is within the express language of subdivision 3 of said section 775 when read in connection with the first and last words of the section and independently of the other subdivisions thereof. When so read the section is plain and unambiguous and does not require or permit of construction.

The caption of section 775 does not in terms limit the word " position " to public position nor the word " authority " to official authority, and there is nothing therein or in the section itself to prevent its being read to mean " Corrupt use of public or other position, or official or other authority."

If Willett had paid Cassidy and Walter a sum of money on Cassidy's promise to procure by influence or otherwise from a public officer an appointment or nomination that the public officer had the power to make, his criminal liability under the statute as we understand would not be disputed.

We think the statute should be construed to include a promise to procure, or cause by the same influence or otherwise, a nomination to public office by a political convention. This conclusion is to some extent supported by the definitions contained in

section 750 of the article relating to crimes against the elective franchise.

A person in a position or having authority, official or otherwise, by influence or otherwise, to procure or cause a nomination to public office, who, for a price, offers to procure or cause such nomination to office by a public officer or through a nomination by a political convention, and the person who requests such nomination and offers to pay the price, is " any person " within the meaning of said section 775.

It is claimed by the defendant that the court erred in making certain rulings relating to the admission of evidence during the trial.

There were three persons to be elected justices of the Supreme Court in the second judicial district in 1911. At the judicial convention at which the defendant was nominated two other persons were nominated, the three constituting the Democratic party nominees for justices of the Supreme Court.

On the 18th day of October following the Democratic judicial convention an editorial appeared in the Standard Union, a newspaper printed and published in the borough of Brooklyn, which editorial was headed " Tammany's Tainted Touch on a Judiciary Ticket," and it was therein stated, among other things, that " The Democratic people had nothing to do with these nominations. The candidates are Boss nominees pure and simple, and as to one of them there is already a rumor of a shocking scandal involving the payment of a large sum of money." The morning after such editorial was published the three nominees mentioned met and discussed it among themselves and thereafter with counsel selected by them. The result of the conference was that separate affidavits or informations substantially the same in form were prepared and signed by each upon which a warrant was issued and the proprietor of said newspaper was arrested for criminal libel. In the affidavit of the defendant, which was used on the application for the war-

rant, he quoted a large part of said editorial and also referred to it as marked " A," and it was in its entirety attached to his affidavit, and made a part thereof. The warrant was issued and the defendant named therein appeared in court thereon October 20th, and the proceeding was adjourned until October 23d, and on that day, at the request of counsel for complainants, was again adjourned until October 27th. During the conversations between the three nominees and the counsel mentioned, on October 19th, one of the nominees suggested that a statement should be made to counsel by each to include everything that could be said or might possibly be said regarding his connection with the nomination. One of the nominees then stated that some weeks before he was a candidate for the Supreme Court judgeship he contributed $200 to the Democratic organization of Kings county. He said that he had contributed that amount to the organization in other years. He further stated that he might be criticised because of an appointment made by him as surrogate to the position of chief clerk in the surrogate's office, and he went into some detail in explanation of the propriety of the appointment made by him. The second nominee said that he had paid $150 to the county Democratic organization and that he had contributed to such organization for a number of years, and that such contribution was the only thing he could think of that anybody could say against him in connection with the nomination. The defendant then said, " They have nothing at all against me. It is not possible for anybody to allege a thing against me in regard to this nomination."

On the day before the nomination the defendant had an interview with the president of a bank and asked for a loan of $10,000 on collateral. The president of the bank testified that he asked him why he wanted the money and his testimony continues as follows: " He said there was a chance for him to get the nomination for Supreme Court judge and, as I recall

it, he said it took some money, and if he got the nomination whatever money he used would have to be used in advance," and " I think he referred to it as a contribution for campaign expenses or something of that sort and I remember he said that after the nomination he would have to sit up and look dignified; that he could not use any money then or words to that effect," and " He certainly said it took the money to get the nomination." The defendant was told by the president of the bank that he would let him know the next day and it was arranged to meet at the bank at nine o'clock the next morning, which was the day of the convention. The defendant appeared at the bank as agreed, and obtained the loan and at his request received the money in ten one-thousand-dollar bills. The defendant had within a few days prior to the day of the convention borrowed the futher sum of $15,000 in two separate loans of $5,000 and $10,000. On Saturday, October 21st, the president of the bank specially referred to was out of town and returned after eleven o'clock in the evening and found the defendant at his home waiting for him. The defendant referred to the criminal proceeding and asked if it would help the matter if he paid the loan and was told that it would not, as it was a matter of record. The president of the bank said to him that he would not stultify himself; that he could not forget and that he must tell the truth. He further said that unless he (the defendant could prevent his testimony being received by reason of their confidential relation, he (the defendant) " must not have him on the stand," and advised him to withdraw the proceeding. On October 23, and after the adjournment of the proceeding on that day, the nominees were together and the defendant then said to his associates that he had, before the convention, borrowed $10,000 from a bank and took it in ten one-thousand dollar bills and that he found that the officers of the bank were among the witnesses for the defense in court at the time of the adjournment. He further said that he had

been intimate and confidential with these men but they had evidently been talking and telling what they knew. The defendant further said that he knew that it would cost him $6,-000 to circularize the district and that he would need money and that he had the money then on hand and that he could explain borrowing the $10,000. Following this conversation and before the adjourned date of the proceeding a letter was written and signed by each of the three candidates, of which the following is a copy:

"BROOKLYN, *Oct.* 26, 1911.

" Mr WILLIAM BERRI,
        " Dear Mr. Berri:
    " Referring to the matter of the proceedings now pending in the Magistrate's court wherein we are the complainants against you, certain facts have been brought to our attention which make it apparent that the prosecution was instituted mistakenly. We now join in saying that we sincerely regret having instituted these proceedings or having thereby caused you any annoyance. We shall instruct our counsel to terminate the matter by withdrawal of the proceedings in court.
            " Very truly yours,
                        " HERBERT T. KETCHAM,
                        " WILLIAM WILLETT,
                        " PATRICK E. CALLAHAN."

After the proceeding for criminal libel was withdrawn and on October 28th the two candidates other than the defendant each published a personal statement; these statements were read over by the defendant before they were published and he said, " Well, then, I shall have to make a statement," and he then prepared a personal statement, the first paragraph of which is as follows: " In view of the extraordinary statements made by my associates on the ticket I deem it justice to myself to make a plain statement of my financial affairs during the

past month which is now assumed to be the foundation of the *Standard Union* attack."

It is claimed by the People that the statement then made by him in regard to his financial affairs was partial, misleading and not wholly true. We further summarize the story. The editorial was published on Wednesday. The libel proceeding was begun on Friday following. It was necessarily founded upon the assumption that each of the three candidates for justice of the Supreme Court was innocent of the charges made in the editorial. Late the following Saturday night the defendant sought the banker from whom he had procured the loan to use as a campaign contribution, as we have stated, to see if the payment of the loan would aid him. He found that its payment would not aid him. On the Monday following the defendant found the bank officers of said bank in court as witnesses for the defense in the libel case and, apparently appreciating that the loan and the statements made by him in connection with obtaining the loan would be told in court, he, for the first time told of the loan made on the morning of the convention and he attempted to explain its purpose to his associates. All apparently assumed that the charge of criminal libel could not be sustained and it was withdrawn and each made a statement to the press as already stated. Substantially all of the facts as herein stated were received upon the trial without objection. The editorial, the affidavits and the statements to the press by the defendant's associates were each objected to and their admission is now urged as error that should reverse the judgment of conviction against the defendant. Very many of the statements in such papers are also in evidence without objection.

The editorials, affidavits and statements were not evidence of the facts contained therein, and they should not have been received as a part of the record of the trial except that they and each of them were so connected with the history of the

transaction leading up to the defendant's indictment and associated with his acts and words, and particularly as the editorial was referred to by the defendant and made part of his affidavit upon which a warrant was obtained against the publisher of the newspaper and was so necessarily connected with the retraction signed by the defendant and admitted in evidence without objection, and the statements of the defendant's fellow nominees being referred to and constituting the basis for making the published statement of the defendant, it was proper to have all such papers before the court from which to determine in connection with the other evidence whether the defendant by concealing information, and by partial statements, equivocation, and by untruthfulness, evidenced consciousness of guilt.

When a person is publicly accused of crime, or is accused by formal criminal proceedings, a guilty consciousness may always be inferred from falsehood, misrepresentation, evasion, equivocation or by suppression of the facts in regard to the same. (Wigmore on Evidence, section 278; People v. Conroy, 97 N. Y. 62, 80; People v. Place, 157 N. Y. 584, 598; People v. O'Neill, 112 N. Y. 355, 363; Greenfield v. People, 85 N. Y. 75, 85; People v. Hughson, 154 N. Y. 153.)

When the editorial was received in evidence it was limited by the court as follows: " I will say to the jury that no matter what it charges against anybody else or against any organization or the purposes of any change in the district or anything of that kind or even a charge direct against Mr. Willett that is not evidence against him and the sole purpose of admitting the article is that it may illustrate, if it does tend to do so, any remark or omission to remark upon the part of Mr. Willett."

The court in the charge to the jury said: " Now in the early part of the trial there were offered and admitted in evidence, statements made by Judge Ketcham and Mr. Callahan,

who were associates upon the Democratic ticket with the defendant here, and in whose statements there may be some assertions which would tend to indicate that this defendant was guilty, but they are not to be regarded by you as evidence of his guilt in any way. These are allowed in evidence for the purpose of determining whether this defendant's conduct, in the light of those statements, was indicative of guilt or innocence. You can readily understand that if some one comes to a person accused of crime and says something to him, and then he makes reply, the thing that is said to him is as essential in understanding his reply as his reply itself; so that when Mr. Willett made statements, what those statements were made in the light of is essential, that you may see whether his conduct was indicative of guilt or innocence. The same is true as to the article published in the *Standard Union*. These are admitted in evidence, so that you can see just what the charge was, and whether this man's conduct, when he knew what he was charged with, when he knew how vicious the charge was, indicated his freedom from guilt or his consciousness of guilt."

Under the circumstances shown in this case the admission of the editorial and statements in evidence was not error.

The defendant, in his published statement, said that from $20,000 that he then admitted he had recently borrowed he had used $5,000 to take up a note of that amount due October 22, 1911. Considerable testimony was given by the People, subject to the defendant's objection, to show that the defendant's brother took up said note due October 22, 1911, with his own money. The evidence so given was proper as tending to disprove the defendant's statement that he took up such note with a part of the money so borrowed by him. The other questions presented by the defendant do not require discussion.

The learned Appellate Division in its opinion unanimously affirming the judgment used the following language: " Upon the trial * * * the proof of guilt was so conclusive that

without hesitation the jury rendered its verdict. The learned counsel for appellant neither upon the oral argument nor in the brief submitted by him contends that such verdict was contrary to the evidence or to the weight thereof. * * * We have expressed our convictions as to the weight of evidence. The cause of justice would be hindered and not promoted by ordering a new trial in this case."

The substantial rights of the defendant were not affected by anything that occurred on the trial. (Code of Criminal Procedure, section 542.)

The judgment of conviction should be affirmed.

WILLARD BARTLETT, Ch. J., WERNER, HISCOCK, COLLIN, CUDDEBACK and MILLER, JJ., concur.

Judgment of conviction affirmed.