Leonard H. Sandler, J.
The defendants, Patrick J. Cunningham and Anthony J. Mercorella, are charged in several indictments with violations of different provisions of the Election Law and the Penal Law arising out of circumstances attending Mr. Mercorella’s nomination by the Democratic Party in Bronx County as a candidate for Judge of the Civil Court in 1975.
The defendants have moved this court to inspect the Grand Jury minutes and upon inspection to dismiss the indictments for alleged legal insufficiency and for other reasons. Both are *1067 named in one indictment and each is charged individually in the other two indictments. Although alleging violations of different sections of law, the indictments rest ultimately upon two propositions.
First, it is alleged that Mr. Cunningham, county leader of the Bronx Democratic Party, tendered his support for the Democratic nomination for Judge of the Civil Court in return for a promise by Mr. Mercorella, a city councilman, that he would resign that position at a time that would result in a political benefit to the regular Democratic organization.
Second, it is claimed that Mr. Cunningham offered his support in further consideration of Mr. Mercorella’s agreement to make a contribution to the Democratic county committee.
The legal issues presented by these indictments are important and in some respects novel. Significant issues are also raised by aspects of the presentation of the evidence to the Grand Jury as well as from the unusual, highly publicized events that preceded, and to some extent, accompanied the Grand Jury presentation.
THE EVIDENCE
Although the Grand Jury testimony and exhibits number substantially in excess of 1,000 pages, only a few pages include evidence directly pertinent to these charges. Most of this limited body of relevant evidence was derived from court-authorized electronic surveillance of the office phone and office of the law firm of Mercorella and Kase, instituted some months before the pertinent events in connection with an unrelated investigation. The legality of that surveillance is not before me on this motion. Apart from it, only one directly relevant fact was elicited from any of the witnesses called before the Grand Jury.
In addition, a body of appropriate background information was also presented coming from the electronic interceptions as well as from witnesses who testified.
Inevitably because of circumstances inherent in the investigation, this background information, although useful and appropriate, was less than complete. Much of it represented the necessarily limited perspective of one of the principal participants, Mr. Mercorella. And the other background information came from witnesses associated with the Bronx regu *1068 lar Democratic organization, who were given immunity, and viewed by the former Special Prosecutor as hostile witnesses. Nevertheless, I think it helpful to an understanding of the evidence before the Grand Jury that some effort be made to set forth the context in which the critical events occurred.
Three Civil Court vacancies in Bronx County were to be filled in the November, 1975 elections. Two of these were county-wide contests. One involved a district election embracing only part of the county. Of the two county-wide vacancies, one had been filled on an interim basis by an appointment of the Mayor. The other county-wide vacancy was also available during 1975 for a similar interim appointment but none was made for reasons not explained in the testimony.
In 1975 there existed in Bronx County, as there had for a number of years, an ongoing factional struggle in the Democratic Party between the regular Democratic organization headed by Mr. Cunningham and an organization of Bronx Democrats associated with the city-wide Democratic Party reform movement. A characteristic of this struggle in The Bronx was that the reform movement had been generally unsuccessful in the election of district leaders who form the executive committee that designates the county leader, but it had achieved some degree of electoral success over the years in primary contests for public office.
It was thus anticipated that the designees of the regular organization would face opposition in the Democratic primary for the nominations in question. In light of previous results, it would have been a realistic judgment that the candidates of the regular organization for county-wide judicial positions would be favored to win such primaries, but contrary to the view advanced in the brief of the Special Prosecutor and implicit in the Grand Jury presentation, that result was by no means assured.
The electronic interceptions provide a relatively clear picture of the situation as it appeared from Mr. Mercorella’s viewpoint, although one by no means free from ambiguity.
Mr. Mercorella was then a member of the city council, having served previously for a number of terms in the Assembly. The impression conveyed from his intercepted conversations was that he wished to become a Judge but was by no means anxious that it occur in 1975, and that he was particularly unhappy at the prospect of having to undergo a primary race to achieve that position.
*1069 Very little basis appears in the Grand Jury minutes for assessing Mr. Cunningham’s evaluation of the situation. Although a matter of some conjecture it would seem reasonable to suppose that he was influenced at least in part by a combination of traditional considerations weighed by party leaders who have a dominant role in determining the nominees of the regular Democratic organization. These would presumably include, among other factors, a desire to win the anticipated primaries, clearly important to his continued power and prestige, and to maintain the strength of the organizations supporting him by selections broadly representative of them. To what extent he was also influenced by a thoughtful concern for the qualifications of the candidates to be Judges is a matter on which the record before me provides no illumination.
It is clear that by accepted political criteria Mr. Mercorella had a strong claim to one of the judicial nominations if he wished it. He had demonstrated popularity in repeated elections; was a politically prominent member of one of the several ethnic groups in this city assiduously cultivated by political organizations; had demonstrated some political appeal to groups outside the regular organization; and had relevant prior service as a chief law assistant in the Civil Court in Bronx County. In addition, as Mr. Mercorella noted in an intercepted conversation, his election would make available a councilmatic position for another — a consideration often valued by political organizations.
It appears from intercepted conversations of May 7, 1975 that Mr. Mercorella had met shortly before with Mr. Cunningham who had offered him his backing for the Democratic nomination for one of the vacancies. From the tenor of those telephone conversations it is apparent that Mr. Mercorella intended to accept it. In one of the conversations of that date he expressed the view that support had been offered to him, although he had not actively sought it, because a member of his club wished to succeed him in the city council and that member had the strong backing of a family, identified in other conversations as wealthy business people.
It seems likely that the meeting described by Mr. Mercorella was the same one referred to before the Grand Jury by a witness who said he was present at a conversation during which Mr. Cunningham offered Mr. Mercorella his support and in the same conversation requested an early resignation. *1070 The significance of the requested early resignation was that it made possible an election to succeed Mr. Mercorella to the city council in 1975 at a time when, in accordance with relevant statutory provisions, the Democratic nominee would be designated by the county committee controlled by the regular Democratic organization. It thus had the welcome effect from the standpoint of the regular Democratic organization of avoiding a primary contest for that position in the following year.
In a conversation between Mr. Mercorella and his law partner, Mr. Kase, on May 16, 1975, Mr. Mercorella described a second meeting that he had with Mr. Cunningham apparently on the prior day. This intercepted conversation played a critical role in the events that led to the Grand Jury investigation and to this indictment.
Most of the discussion between the two partners was concerned with the disturbing information that Mr. Cunningham had told Mr. Mercorella that the firm was under investigation by the office of the Special Prosecutor. Although, as reported by Mr. Mercorella, he had emphatically denied any wrongdoing on the part of himself or Mr. Kase, Mr. Cunningham had raised without resolving the question whether it would be desirable to defer his judicial aspirations for another year. In addition, Mr. Cunningham had indicated that it would not be prudent to submit Mr. Mercorella’s name to the Mayor’s screening committee for a possible interim appointment following the primary, as apparently had been originally contemplated. A time came in this conversation when, as reported in an accurate transcript, the following was said:
"Mercorella: And then of course there, there are other demands that, you know like financial demands, money, promises.
"Kase: I know.
"Mercorella: Depending on what happens in the outcome.
"Kase: Hmmm.
"Mercorella: Er, oh said contragation (ph) of the County Committee * * *
"Kase: Promptly.
"Mercorella: 7,500 and no contract to win the primary, and more than that he doesn’t know. He says if you have not primary, it goes to the board. It’s the only way, he says you *1071 don’t need * * * only way * * * (unintelligible) * * * but who’s gonna take care of me.
"Kase: But peanuts, that he gets for the job, ah, it’s peanuts considering * * *
"Mercorella: In facing the prospects of losing the job, too.
"Kase: Yeah.
"Mercorella: For three months.”
Further in the conversation Mr. Mercorella expressed his suspicion that the alleged investigation was being used by Mr. Cunningham as a "ploy” to eliminate him from consideration for the judicial nomination. And still further on Mr. Mercorella says the following: "But, ah, I’m going to tell him about it, yeah, I’m going to tell him I need some money, I can’t live for three months no salary, four, wait a minute, four months, no salary is too much.”
The conversation ended on the basic theme that Mr. Mercorella’s designation was now uncertain and would have to await results of inquiries it was assumed would be made by Mr. Cunningham to determine whether there was a factual basis to the reported investigation.
In a later conversation between the two partners on June 3, 1976, Mr. Mercorella, apparently referring to the same meeting with Mr. Cunningham, said: "And my last words with him was that we would work something out about, ah, making a contribution.”
The events that followed are for the most part a matter of public record. At a time and place not developed in the evidence Mr. Mercorella was designated by the executive committee of the Bronx Democratic Party organization as one of its candidates in the primary, and together with another county-wide candidate, participated in a primary contest with an opponent supported by the reform organization. This contest was accompanied by a legal effort to invalidate the petitions of their opponent that was ultimately successful in the Court of Appeals in a decision filed a few days before primary day in September, 1975.
Just after this decision and before the primary, Mr. Mercorella mentioned to his secretary that he had to "get out $3,000 more” in the next day because of commitments made "for delegate races and so on.” As to this comment I am now persuaded that defense counsel is clearly correct in the argument that it referred, not to the May conversation with Mr. *1072 Cunningham described above, but to the circumstance that during the primary campaign undertaken jointly with other regular organization candidates, financial obligations had been assumed that he was required to meet.
Further intercepted conversations disclose Mr. Mercorella unhappily preparing to submit his resignation on September 18 or 19, disturbed that it would deprive him of income for a period of months and his family of the protection of his pension and insurance coverage, and accordingly anxious to secure an interim government position for the interval of time before he assumed judicial office. The resignation was in fact submitted on September 18 or 19. The Democratic county committee then designated the Democratic candidate to succeed him for the November, 1975 election, who was thereafter elected to a full term, having first been elected for the interim period following the resignation by a vote of the city council in accordance with applicable statutory provisions.
Significantly the record is barren of any evidence that Mr. Mercorella, or any committee acting on his behalf, in fact made any payment to the Democratic county committee.
THE EARLY RESIGNATION
Although linked together in several counts of the indictment, it is clear that the legal issues presented by the early resignation and the alleged promise to contribute to the county committee are different in significant respects and require for the most part a separate analysis.
The first count of the indictment naming both defendants asserts a violation of subdivision 3 of section 448 of the Election Law. This count, which brings together the principal themes of the prosecution, is in my view the most important in the several indictments and lends itself most conveniently to an analysis of the issues presented. The count closely follows the language of subdivision 3 of section 448 of the Election Law, the wording of which was unchanged since the original section was enacted by chapter 676 of the Laws of 1881.
The count charges in substance that Mr. Cunningham "between in or about April, 1975 and in or about September, 1975, tendered and offered to procure and cause the nomination of the defendant, Anthony J. Mercorella, for Judge of the Civil Court of the City of New York, and the defendant *1073 Mercorella accepted such nomination, upon an understanding and promise of the payment and contribution of valuable consideration. This understanding and promise was that the defendant would pay a sum of money to the defendant Cunningham and the Bronx County Democratic Committee and would also prematurely resign his position as a member of the New York City Council during a specific period of time which would enable the defendant Cunningham and the Bronx County Democratic Committee to designate another person to his City Councilmanic position without a primary election.”
A disturbing feature of this count is the charge that there was a promise to "pay a sum of money to the defendant Cunningham.” There is not one word of evidence in the record that supports this statement, and I have been unable to find any appropriate explanation for it.
Conceivably this language was included in an effort to anticipate the argument in fact thereafter made by the defendants that the section is expressly limited to a promise of valuable consideration to "a person” and is accordingly inapplicable. This defense position seems to me insubstantial. But if it did have merit, the insertion in the instant count of a charge not sustained by the evidence was not a proper response.
The defendants also challenge the applicability of the section on the claim that no individual, however influential, could "cause the nomination” of a person when the law reposes that power in the enrolled voters of a party to be exercised in a primary election. This is a variation of the argument first advanced in the leading case of People v Willett (213 NY 368) where it was rejected by the Court of Appeals as applied to a nomination in a judicial convention.
Undoubtedly the power of any individual, however influential, to deliver a nomination in a contested primary is significantly less than the power that might be exercised at a judicial convention. Indeed the recent political history of Bronx County refutes the notion that even Mr. Cunningham had the unqualified power to "cause” such a nomination. The language of the section is in fact not well suited to a primary election and the attack made upon its application is a substantial one.
However, to accept the interpretation urged by the defendants would leave so wide a gap in the intended statutory protection against corrupt practices in nominations for public *1074 office that it could be adopted only if there were no reasonable alternative. (Cf. United States v Hood, 343 US 148.) Recognizing the inaptness of the language of the section to the situation presented, I nonetheless believe that the principle of the Willett case may be applied reasonably to primary elections.
Turning to the issue posed by the resignation, the evidence satisfactorily establishes that Mr. Cunningham requested that Mr. Mercorella resign as city councilman at a time when it would be politically beneficial to the regular Democratic organization. The evidence is less decisive that Mr. Mercorella in fact made such a promise. However, from the fact of his resignation at the requested time, coupled with the thrust of various remarks made by him in intercepted conversations, the Grand Jury in my view could have reasonably drawn the circumstantial inference that such a commitment had been made.
The critical issue presented is whether or not such an arrangement is in fact a violation of subdivision 3 of section 448 of the Election Law or of any of the other sections relied upon in the several counts. More precisely the immediate question is whether the language in subdivision 3 of section 448 "payment or contribution of any valuable consideration, or upon an understanding or promise thereof’ means or reasonably may be construed to mean the conferring of a political benefit of the kind described. For a number of reasons I have concluded that the language does not fairly carry that meaning.
The word "consideration” by itself might well be thought to include the promise of a political benefit. The phrase considered as a whole "payment or contribution of any valuable consideration” seems to me much more naturally to imply a material benefit.
This construction is confirmed by the wording of section 200.45 of the Penal Law, passed in 1965 as part of a comprehensive, carefully studied revision of the penal statutes, which undertook quite purposefully to deal with precisely the same area of activity covered by subdivision 3 of section 448 of the Election Law. In so doing, section 200.45 limited its prohibition quite specifically to the conferring or agreement to confer "any money or other property,” and thus excluded from its ambit the kind of political advantage relied upon in this count.
It is true that the practice commentary noted the continu *1075 ing existence of section 448 of the Election Law. However, it is not easy to accept that the authors of the Penal Law undertook deliberately to cover exactly the area of activity dealt with by subdivision 3 of section 448, using very similar language except more contemporary in phrasing, with the understanding that significantly different consequences might follow from the application of the two sections.
This view is further confirmed by the striking historical fact that in the nearly 100 years that have elapsed since the original section was enacted there appears to have been not a single instance in which anyone was ever indicted in connection with such a resignation. Nor can it be seriously urged by any knowledgeable person that such resignations have not occurred on innumerable occasions involving a broad range of public officials of both political parties, both judicial and nonjudicial, often accompanied by adverse public comment. It does not require an intercepted telephonic conversation to be aware that such events have occurred. For example, where several Civil Court Judges nominated as candidates for the Supreme Court all resign within days of their nomination, as has happened more than once, it does not require an unusually suspicious nature to doubt that this sudden action was the result of an altruistic urge or personal consideration.
The fact that no prosecution has ever been brought in the face of such resignations is not of course conclusive by itself. But surely the settled judgment of prosecutors over so long a period of time, particularly in relation to a section that at best is ambiguous, is entitled to some weight. And this is to say nothing of the palpable unfairness of suddenly invoking the criminal sanction of such a section against those who had every reason to suppose that their conduct was lawful.
Moreover, the interpretation urged by the Special Prosecutor would inevitably involve consequences going far beyond the peculiarly distasteful situation presented here and would place in jeopardy of criminal prosecution a whole range of political actions that have been uniformly considered lawful. To take only one example, bipartisan nominations for judicial office, which have become customary and widely approved for Judges who have completed satisfactorily a term in office, would, I think, be clearly unlawful under the interpretation urged here by the Special Prosecutor.
Accordingly, I am satisfied that the first count, to the extent to which it rests upon the alleged unlawfulness of a promise *1076 to resign in order to confer a benefit upon a political organization, does not in fact state a violation of the law.
The same analysis applies with even greater force to the second count of the indictment alleging a violation of subdivision 4 of section 448 of the Election Law. In addition to what has been said above, this section was unmistakably designed to apply to events following a nomination and in an election campaign, and for that separate reason cannot be applied to the facts disclosed in the evidence.
In the third and fourth counts of the joint indictment Mr. Mercorella is charged with the crime of official misconduct. The theory underlying the third count is that Mr. Mercorella’s resignation was "an unauthorized exercise of his official functions, knowing that such act was unauthorized.” The theory of the fourth count was that he "knowingly refrained from performing a duty which was imposed upon him by law and was clearly inherent in the nature of his office” by failing to continue in his office. In connection with these two counts, Mr. Cunningham is charged as having abetted Mr. Mercorella in the above-described alleged violations.
These counts suffer from at least three fatal defects. First, they clearly presuppose that an agreement to resign under the circumstances disclosed is independently unlawful, which I do not believe to be sound for reasons indicated above. Second, even if such a resignation was independently unlawful I very much doubt that the application of this section here can be reconciled with the analysis of it set forth in the practice commentaries or the illustrative examples there presented of the behavior intended to be proscribed. Third, the explicit requirement in the section that the unauthorized conduct be known to the violator to be unauthorized is not established by the evidence presented before the Grand Jury.
Finally, in the first count of the People v Mercorella indictment, the alleged agreement to resign is made the basis for a charge against Mr. Mercorella of bribe receiving in the second degree. The theory of this count is that the resignation involved an "exercise of discretion as a public servant” and that Mr. Mercorella was bribed to resign at a particular time by the offer of a nomination to the Civil Court. The single-count indictment against Mr. Cunningham charging him with bribery in the second degree involves precisely the same theory in a different form.
An interesting question is posed whether or not resignation *1077 is in fact an "exercise of discretion” of the kind contemplated by these sections. I am inclined to believe that there are circumstances in which it could reasonably be so considered. The flaw in these counts is that they distort the reality of the underlying events. It is surely an untenable interpretation of the evidence to conclude that Mr. Cunningham wished to bribe Mr. Mercorella to resign as a city councilman at a particular time and conceived the plan of offering him a judicial nomination to secure such a resignation.
Accordingly each of the counts that charge a violation of law based upon the alleged agreement to resign in exchange for support for the nomination are dismissed as well as those aspects of the remaining counts that rest upon the same proposition.
Let me make it emphatically clear that I do not intend by the foregoing to intimate approval of the shabby and cynical maneuver that removed from the enrolled voters of a council-manic district the effective power to participate in the selection of Mr. Mercorella’s successor. I hold only that the early resignation did not constitute the criminal violations charged, not that it was appropriate or acceptable behavior for a judicial candidate or a major political leader casually to sacrifice the basic right to vote in order to advance the interests of a political faction.
THE CONTRIBUTION TO THE COUNTY COMMITTEE •
This brings us to the remaining counts of the indictments, discussed in part previously, all of which rest upon the thesis that as consideration for receiving support for the Democratic nomination Mr. Mercorella, in response to Mr. Cunningham’s request, agreed to make a contribution to the Democratic county committee. These are the first and second counts of the indictment of Cunningham and Mercorella, alleging violations of subdivisions 3 and 4 of section 448, respectively, of the Election Law and the second count of the indictment of Mercorella, alleging a violation by Mr. Mercorella of section 200.45 of the Penal Law.
Preliminarily it is clear that the evidence relating to these counts consists entirely of the intercepted conversations described above, which are inadmissible hearsay as to Mr. Cunningham. The Special Prosecutor’s contention that these conversations are usable against Mr. Cunningham as statements in furtherance of a conspiracy is obviously erroneous. *1078 The law is clear that statements in furtherance of a conspiracy may be introduced against a defendant only if otherwise admissible evidence has established his involvement in a conspiracy. (See, e.g., United States v D’Amato, 493 F2d 359.) No such evidence was presented to this Grand Jury. And even if such evidence had been presented the statements here relied upon could not conceivably be interpreted as having been in furtherance of the alleged conspiracy. Accordingly, the remaining counts of the indictment must be dismissed with regard to Mr. Cunningham.
The question remaining is whether the evidence before the Grand Jury establishes that Mr. Mercorella was criminally culpable in connection with the alleged agreement to make a contribution. The evidence on this point consists exclusively of the two conversations with his partner summarized in an earlier part of the opinion.
The most important of these conversations, that of May 16, 1975 in which Mr. Mercorella undertook to describe his conversation with Mr. Cunningham, unquestionably presents perplexing problems of interpretation. A complete analysis of that conversation and its range of possible meanings would take more space than I think necessary for our purposes.
Roughly two alternative constructions seem to me available. The first is that Mr. Cunningham was requesting a general contribution to the county committee, independent of and not tied to anticipated organization expenses in the expected primary campaign. If this interpretation were accepted, and the promise to contribute was indeed part of an understanding under which Mr. Mercorella received support for his nomination, it would clearly constitute a violation of subdivision 3 of section 448 of the Election Law and section 200.45 of the Penal Law.
The second explanation, which in some respects seems to me more probably correct, is that the contribution was requested in connection with the anticipated primary campaign.
The question presented is whether or not an agreement to make a contribution to a political organization for the purpose of defraying its anticipated expenses in connection with a candidate’s campaign violates subdivision 3 of section 448 of the Election Law and section 200.45 of the Penal Law, if such an agreement is part of the understanding that led to support for the nomination.
The question is a close one. Such an arrangement would *1079 appear to come within the literal language of both statutory provisions. Moreover such understandings have within them an unmistakable potential for abuse of the precise kind that these sections were intended to protect against in terms of the unlawful exactions of moneys from aspiring candidates for general political purposes as well as the possible diversions of such money for private purposes. In the leading case of People v Willett (213 NY 368, supra) the Court of Appeals described how the practice of demanding contributions ostensibly for political funds from candidates was one of the abuses that led to the enactment in 1881 of the section that presently appears as subdivision 3 of section 448 of the Election Law.
Recognizing the weight of this argument, I nonetheless find it ultimately unpersuasive. It is a reality of political life, however regrettable, that the capacity and willingness of candidates to finance their political campaigns is often a significant factor in determining the selection of candidates. It is also an indisputable reality that political organizations, actively engaged in such campaigns on behalf of candidates, inevitably incur, directly or indirectly, expenses which they expect to have reimbursed at least in part from the campaign funds of the candidates who benefit from their efforts. I find it basically unreasonable to suppose that an otherwise lawful conversation between party officials and potential nominees with regard to the financing of an anticipated campaign suddenly becomes criminal if they should explore the possibility that part of the campaign funds to be raised may be used to reimburse some expenses incurred by political organizations supporting the candidate.
Where such discussions take place the test in my opinion must be whether they are in good faith and have a carefully limited, appropriate purpose.
An additional problem here, not adequately presented to the Grand Jury, is whether or not Mr. Mercorella in fact made a financial commitment that could be viewed fairly as part of the understanding under which he received support for the Democratic nomination. Given the fact that the support was first offered without his soliciting it, and that by traditional political criteria he had a compelling claim to the nomination, I find it extremely dubious that he was supported for the nomination because, in response to a request for a contribution, he said he would work something out.
I do not decide here that the Grand Jury could not reason *1080 ably have concluded that the requested contribution was a general one, not limited to the expenses of the primary campaign, although the evidence provided by the intercepted conversations between the two law partners presents in my view a tenuous basis for such a judgment. As the issue was presented to the Grand Jury in the instructions of the Special Prosecutor, they could have voted these indictments even if it had been concluded that the requested contribution was in fact a bona fide one, to be limited to expenses reasonably anticipated in connection with the primary campaign.
It would be unfair to criticize that aspect of the instructions since, as indicated above, the legal issue is a close one. But in light of my own finding, it is clear that indictments that could easily have been based upon a factual finding that would not constitute criminal conduct cannot stand. (See CPL 210.35, subd 5; 190.25, subd 6; 190.30, subds 5, 6; see People v Percy, 74 Misc 2d 522, affd 45 AD2d 284; People v Mackey, 82 Misc 2d 766.)
A notable feature of the record here is that no evidence was presented that any contribution was in fact ever made. Indeed the evidence against Mr. Mercorella rests entirely upon his own statements, and there is no other evidence before the Grand Jury whatever of the crimes charged.
CPL 60.50 provides in familiar language: "A person may not be convicted of any offense solely upon evidence of a confession or admission made by him without additional proof that the offense charged has been committed.” Prior to the adoption of the Criminal Procedure Law, it had been the clear rule that an indictment based upon evidence lacking the corroboration required by law must be dismissed. (See, e.g., People v Nitzberg, 289 NY 523.) Recent appellate decisions, interpreting the new law, have held with regard to the comparable problem presented where accomplice testimony was not corroborated before the Grand Jury that the indictment may be valid although the evidence would be legally insufficient to submit to a trial jury. (See People v King, 48 AD2d 457; People v Clarkson, 50 AD2d 903.) The result of course is an anomalous one since it permits indictments to be filed where a prosecutor cannot in fact proceed to trial. Presumably, it would be rare for a prosecutor knowingly to seek an indictment where the available evidence would be legally insufficient at trial.
*1081 SOME ASPECTS OF THE PRESENTATION
Although not necessary to my decision, certain aspects of the presentation merit further comment because they invite attention to difficult problems in the work of investigative Grand Juries that are likely to recur and have received disturbingly little judicial consideration.
It is of course basic law in New York that a Grand Jury may indict only on the basis of competent legal evidence. (See CPL 190.30 and 190.65.) The basic obligation of prosecutors, who are empowered by statute to act as legal advisers to the Grand Jury, is to insure that only such evidence is considered. (See CPL 190.25, subd 6.)
On the other hand, it is equally fundamental that in the investigative phases of the Grand Jury, hearsay and other usually inadmissible evidence may appropriately be elicited in an effort to develop leads to other evidence of criminal conduct.
Where evidence is developed in the course of such an investigation that merits consideration of an indictment, problems of considerable complexity may be presented.
W/hat occurred in this case was more than a simple presentation of evidence developed with regard to these defendants and submitted to the Grand Jury for their judgment as to whether or not indictments should be voted. On the basis of the electronic surveillance and possibly other information as well, the former Special Prosecutor undertook a detailed exhaustive Grand Jury investigation designed to confirm, if possible, the theory that criminality had attended Mr. Mercorella’s nomination and, in addition, to determine whether or not acts of criminality were also present in the nomination of other Democratic candidates in Bronx County in 1975, as well as in previous years.
As part of that effort, techniques were used that were entirely appropriate in the investigative phase of the Grand Jury’s operation but raised severe problems of fairness and propriety when presented to the same Grand Jury that was asked to consider an indictment against these defendants in connection with these particular charges.
Witnesses from the Bronx regular Democratic organization were given immunity and questioned, correctly or not, on the basis that they were hostile witnesses not likely to give truthful answers unless closely pressed by the interrogators. It *1082 was common to put to these witnesses questions leading in form, based on hearsay, rumor and speculation, that assumed facts not in evidence, and invited hearsay and speculative responses from the witnesses.
There were marked in evidence and played to the Grand Jury tapes of intercepted conversations in which witnesses and others had engaged in cynical gossip and suspicious speculation as to the reasons underlying certain designations. The witnesses themselves were asked to confirm comments that they and others had made, and were closely and skeptically questioned as to their explanations. And throughout these interrogations, which covered many hundreds of pages of Grand Jury testimony, the obvious assumption of the former Special Prosecutor and his assistants that wide-spread criminality regularly attended Democratic Party nominations in Bronx County was unmistakably conveyed to the Grand Jury, although in fact no confirmatory evidence was ever elicited.
The problem of fairness with regard to a consideration of the instant charges thus raised was not appreciated by those who presented the matter. The Grand Jury was not instructed with the particularity clearly required to disregard these aspects of the interrogation, and indeed were not instructed to disregard them at all. Indeed, in the final instructions on the law the Grand Jury was invited in general terms to consider all of the evidence that had been presented even though it was obvious that much of it was irrelevant and inescapably prejudicial.
I think it clear that this characteristic of the Grand Jury proceedings would have independently required dismissal of these indictments.
THE IMPACT OF THE PREJUDICIAL PUBLICITY
In the motion papers submitted by both defendants, and particularly by Mr. Cunningham, it was strongly urged that the overwhelming prejudicial publicity preceding and accompanying the Grand Jury presentation would also mandate dismissal. For reasons already indicated the court is not required to reach that issue, but it presents a problem of such importance that some comment seems to me clearly necessary. Some circumstances attending the presentation with which we have been concerned may be unique in the history of American criminal jurisprudence.
*1083 In my description of these events, I intend no criticism of any individual. My concern is to set forth as accurately and objectively as I can the peculiarly disturbing context in which this presentation occurred.
It is a matter of public record that following the attempted dismissal of the former Special Prosecutor on December 23, 1975, he charged that the Governor’s action had been the result of intervention by persons who felt threatened by investigations conducted by his office. In connection with that charge he referred particularly to persons in high places whom he described as "franchised corrupters who manipulate all of us,” and implied that they were among those who had influenced the Governor to dismiss him. The controversy that followed was marked by enormous public interest and intense feelings and understandably received a high degree of attention from the media.
A judgment was formed by the Attorney-General, who had the effective legal power to remove and appoint, that the former Special Prosecutor should remain in office for an additional six months to finish the investigations that he stated he was engaged in. This decision, clearly a reasonable one, received from the public and the media almost uniform approval and support.
Following the six months’ extension, a subpoena was served on Mr. Cunningham and several associated with him in the Bronx regular Democratic organization. A motion to quash was made on Mr. Cunningham’s behalf that challenged vigorously the good faith underlying the service of this process. This was responded to by the former Special Prosecutor in an affidavit that condemned Mr. Cunningham in sweeping terms as a central figure in wide-spread criminality affecting nominations for judicial and other offices.
I do not doubt the sincerity and good faith of the former Special Prosecutor in the assertions that he made. But basic fairness requires it to be said explicitly, as indisputably established by the record of these Grand Jury proceedings, that this charge was not justified by the evidence then at his disposal, and was not substantiated by the investigation that followed.
The service of the subpoena and the charges made in the following litigation clearly linked Mr. Cunningham with the previously unnamed alleged corrupters who had supposedly misled the Governor into the attempted dismissal. The setting *1084 in which this investigation was undertaken, representing the fault of no single individual, but the result of a complex interaction of personalities and forces, was thus an extraordinary one.
In effect, the former Special Prosecutor was authorized and virtually required to undertake in a limited period of time an investigation to confirm the truthfulness of public charges he had previously made both specifically and by inference that the prime subject of his investigation was a corrupter who had sought his dismissal. And this investigation was undertaken under circumstances that clearly held out the possibility that the former Special Prosecutor’s further continuance in office might be influenced by his capacity to develop indictments that would support the accuracy of these charges. Given these realities, it must be said that the former Special Prosecutor acted, in some respects, with conspicuous restraint. The repeated strong admonitions to the Grand Jury by him and his associates to consider only the evidence before them, and disregard all other considerations, were exemplary.
But I cannot believe that a criminal investigation pursued in such an atmosphere, however well intentioned the prosecutors, can easily be reconciled with the thoughtful, objective and dispassionate discharge of their duties that the law expects of prosecutors and Grand Juries. Nor do I find it easy to accept that a Grand Jury impaneled long before these controversial events occurred, and accustomed to an appropriately co-operative relationship with those who served as their legal advisers, could have been unaware of the significance of the public events described above or wholly unaffected by them.
In view of the conclusions reached earlier, it is not necessary to decide here what would have been an appropriate judicial response if these indictments were otherwise deemed sufficient, but that some action would have been required cannot be doubted. (Cf. United States v Sweig, 316 F Supp 1148, 1155.)
CONCLUSION
For the reasons indicated, each of the indictments is dismissed. If it is the desire of the Special Prosecutor to represent any part of these matters to another Grand Jury, I will give thoughtful consideration to a written application *1085 that delineates the factual and legal reasons for such a request.