United States v. Halloran

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

———————

August Term, 2015

(Argued: January 26, 2016    Decided: April 28, 2016)

Docket No. 15-996-cr

———————

UNITED STATES OF AMERICA,

*Appellee*,

— v. —

DANIEL J. HALLORAN,

*Defendant-Appellant*,

MALCOLM A. SMITH, VINCENT TABONE, JOSEPH J. SAVINO, NORAMIE JASMIN, and JOSEPH DESMARET,

*Defendants.*

———————

B e f o r e:

CALABRESI, LYNCH, and LOHIER, *Circuit Judges.*

———————

Defendant-appellant Daniel J. Halloran appeals from a judgment of the United States District Court for the Southern District of New York (Kenneth M. Karas, *Judge*) convicting him, following a jury trial, of wire fraud, violating the Travel Act, and conspiracy to commit both substantive offenses. The convictions arose from two bribery schemes, in which Halloran, a member of the New York City Council, (1) accepted bribes in exchange for promising the bribe payers access to City funding, and (2) arranged for bribes to be paid to Republican Party officials in exchange for a "Wilson-Pakula" authorization for his co-defendant to compete for the Republican Party nomination for mayor of New York City. We conclude that there was sufficient evidence that Halloran intended to divert city funds to sustain his convictions relating to the first scheme, that the payment of bribes in exchange for a Wilson-Pakula certificate violates the New York bribery statutes underlying Halloran's Travel Act conviction, and that the honest-services fraud statute is not unconstitutionally vague as applied to that conduct. We further hold that Halloran's sentence was reasonable and reject his remaining arguments.

AFFIRMED.

———————

JONATHAN I. EDELSTEIN, Edelstein & Grossman, New York, New York, *for Defendant-Appellant*.

Daniel J. Halloran, pro se, Ashland, Kentucky.

JESSICA FEINSTEIN (Karl Metzner, *on the brief*), Assistant United States Attorneys, for Preet Bharara, United States Attorney for the Southern District of New York, New York, New York, *for Appellee*.

———————

2

GERARD E. LYNCH, *Circuit Judge*:

Defendant-appellant Daniel J. Halloran appeals from a judgment of conviction entered in the United States District Court for the Southern District of New York (Kenneth M. Karas, *Judge*) on two counts of wire fraud, 18 U.S.C. §§ 1343, 1346; two counts of violating the Travel Act, 18 U.S.C. § 1952; and one count of conspiracy to commit both substantive offenses, 18 U.S.C. § 371. Halloran, who was at all relevant times a member of the New York City Council, was found guilty by a jury of participating in two bribery schemes. In the first, Halloran accepted bribes in exchange for promising to funnel City funds to the bribe payers (the "Discretionary Funds Scheme"). In the second, Halloran was paid to help his co-defendant, Malcolm A. Smith, bribe Republican Party officials to obtain what is known in New York as a Wilson-Pakula certificate or authorization (a "Wilson-Pakula"), which would have enabled Smith, a Democrat, to compete for the nomination of the Republican Party in the New York mayoral election (the "Wilson-Pakula Scheme"). The district court sentenced Halloran to 120 months' imprisonment.

Halloran challenges his convictions on all counts. With respect to the Discretionary Funds Scheme, Halloran claims that the evidence was legally

3

insufficient to support a finding that he actually intended to divert city funds to the bribe payers. With respect to the Wilson-Pakula Scheme, Halloran argues that brokering the payment of bribes in exchange for the issuance of a Wilson-Pakula does not violate New York's bribery laws, as required for his Travel Act conviction, and that the honest-services fraud statute is unconstitutionally vague as applied to that conduct. Halloran also challenges the reasonableness of his sentence and raises a number of additional issues in a supplementary pro se brief. Finding none of those arguments meritorious, we affirm the judgment of the district court.

## BACKGROUND

Because the jury found Halloran guilty of all the charges against him, we view the evidence in the light most favorable to the government. *United States v. Facen*, 812 F.3d 280, 283 (2d Cir. 2016).

From 2010 to 2013, Halloran was a Republican member of the New York City Council, representing the 19th District, in Queens. The charges against him resulted from an investigation by an undercover FBI agent, who went by the name Raj and posed as a real estate developer from out of state who was trying

4

to make inroads in New York.[1]  Raj was assisted by Moses "Mark" Stern, a one-time aspiring real estate developer with ties to the Orthodox Jewish community, who was working with the FBI pursuant to a cooperation agreement.  Recordings of conversations between Halloran, Raj and Stern formed the centerpiece of the government's case at trial.

## I.    The Discretionary Funds Scheme

In the Discretionary Funds Scheme, Raj and Stern bribed Halloran to divert $40,000 to $80,000 in "member items" – discretionary funding that is available to City Council members for distribution to nonprofit organizations in their districts – to a fictitious entity purportedly controlled by Raj.

Stern first met Halloran in August 2012.  At a second meeting, on September 7, at a midtown steakhouse, Stern and Halloran discussed member items, and Halloran said it was "[n]ot an issue" to direct those funds to Stern, elaborating: "I give money to JCC, I give money to Chabad in Bay Terrace, I have lots of, you know . . ."  Gov't Ex. 104-T at 4.  Halloran, who was at the time running for Congress, explained that he needed funds for his campaign, and particularly that he hoped to raise enough money to reach the threshold at which

---

[1] Raj testified at trial under the name Anil Modi.

the National Republican Congressional Committee would match his campaign

contributions. Stern pledged a contribution of $15,000, half of which he gave to

Halloran then and there, in cash. Over the course of their meal, Halloran

expatiated on the role of money in New York politics: "It's all about how much[.]

Not . . . whether it will, it's about how much. . . . You can't do anything without

the fucking money. How do you get around that? . . . You can't get around

that." *Id*. at 19. Later, he opined that money was "[w]hat greases the wheels,

good, bad, or indifferent." *Id*. at 24.

On September 27, at the bar of a midtown hotel, Stern introduced Halloran

to Raj, and Raj offered Halloran another $6500. Stern was to arrange to have his

"people," Gov't Ex. 106-T at 3–4, contribute that money to Halloran in the form of

several smaller checks, in order to satisfy federal campaign finance requirements.

Halloran, in turn, guaranteed that it would be "no problem" to get discretionary

funding to Raj and Stern. App'x 534. At that meeting and over the next two

months, the three discussed how to achieve that goal. Raj and Stern made clear

that they had no interest in following the usual channels for obtaining member

items. Halloran suggested that Raj and Stern "set . . . up" an organization to

receive the funds, and "get [him] the [tax] number, the name and address of the

6

Corp." Gov't Ex. 106A-T at 9. That plan was rejected after they determined that starting a new charity that could not be traced to Stern or Halloran could take as long as nine months. The three considered redirecting funding that had already been allocated to organizations that were about to "go under," App'x 459–60, or arranging for someone "on paper" to collect a salary from an existing organization without actually doing any work – a "no-show job." App'x 460–61.

Eventually, the discussion settled on a plan to have the City buy a YMCA building in Bayside for use as a community center by existing nonprofits, using capital funding allocated to Halloran's council district. A fictitious entity owned by Raj, "2Holdings," would collect part of the funds allocated to the project by purportedly acting as a management company or as a consultant. Halloran assured Raj and Stern that the nonprofits would not object to the arrangement, explaining that "these are groups that are my groups," and that, "[i]f I'm putting a deal together they know that they have got to use whoever I'm gonna send them." Gov't Ex. 109-T at 7. He maintained that there was "nothing untoward" about the scheme: "Nobody denies you're allowed to make money on it while you're running these things." *Id*. at 11, 18.

7

Raj requested a letter of commitment from Halloran. On October 23, Halloran forwarded to Stern's email account a letter on Halloran's official letterhead addressed to three different nonprofits, stating Halloran's "intention . . . to acquire the Bayside YMCA on 35th Avenue," and "to allocate $1 Million in capital money to the acquisition and improvement of the facility. I will also allocate discretionary funding as needed up to our allotment of $80,000 in fiscal year 2013 to get the project off the ground." Gov't Ex. 306. Concerned that the letter was not specific enough, Stern requested a second letter addressed to 2Holdings and confirming that it would be involved in the project. On November 15, Halloran forwarded another letter to Raj's email account. This letter was addressed to 2Holdings, requested its "assistance and consultation on the project," and appeared to tie a discretionary funding "allotment of $40,000–$80,000 in fiscal year 2013–14" to 2Holding's "work[ing] with us in implementing the acquisition, renovation, and initial setup-operation of the facility." Gov't Ex. 308.

The next day, Raj met with Halloran at a pastry shop in Flushing and gave him $10,000 in cash in a car outside the shop. (Because by that time Halloran had lost his race for Congress and was no longer disguising the bribes as campaign

8

contributions, he no longer required them to be paid in checks and in small amounts.) In a later conversation, Halloran claimed that his agreed-upon fee for arranging for the diversion of the funds was "fifteen," and stated that "if the other five could come in, I'd be appreciative." Gov't Ex. 214-T at 7. Raj agreed, and arranged for another FBI agent to give Halloran the remaining $5000, on January 25, 2013.

## II. The Wilson-Pakula Scheme

Meanwhile, Raj and Stern were cultivating a relationship with Malcolm Smith, a Democratic state senator who was weighing a run for mayor of New York. Because the field of Democratic mayoral candidates was crowded, Smith was contemplating running as a Republican, without changing his party affiliation. Under New York's "Wilson-Pakula Law," however, a candidate seeking the nomination of a party of which he is not a member must obtain the consent of the appropriate party committee – an authorization known in the New York political world as a "Wilson-Pakula" – before filing a designating petition allowing him to compete in the primary election. N.Y. Elec Law § 6-120(3). For candidates to citywide office in New York City, the "authorization must be by a majority vote of those present at a joint meeting of the executive committees of

9

each of the county committees of the party within the city of New York." *Id*. In practice, according to testimony at trial, this meant that Smith needed the consent of at least three of the five Republican Party county chairs representing the five boroughs of New York City.

On the morning of November 16, 2012, before his meeting with Halloran at the pastry shop, Raj met with Stern and Smith at a hotel in White Plains. Smith expressed his desire to obtain a Wilson-Pakula and enlisted Raj's and Stern's help in swaying the vote of the Chair of the Brooklyn Republican Party, Craig Eaton – a vote he referred to as "huge" and "a game changer." Gov't Ex. 110A-T at 59. Later, at the pastry shop, Raj asked Halloran whether he knew Eaton and whether Eaton was "somebody we can work with" or someone who "can play with us." Gov't Ex. 111-T at 2, 3. Halloran answered in the affirmative and further agreed that the Chair of the Bronx Republican Party, Jay Savino, "can be in play too," *id*. at 4, explaining that "he's a wild man . . . the evil twin of . . . Craig. . . . Craig likes to pretend like he's in control you know . . . . And when we go out, to strip clubs but, uh, Savino doesn't care, he has no pretensions, he's just like, out there." *Id*. at 5.

On December 4, Raj told Halloran that the person who was seeking Eaton's backing was Smith. Halloran immediately offered to help. "First thing we're gonna do is . . . I'm going to have a conversation with the Queens Executive Vice Chair [Vincent Tabone] and tell him that I'm leaning that way. . . . The second thing I'm going to do is, um, I'm gonna . . . pick up the phone . . . and call Eaton and tell him, uh, we need to sit down and just have a meeting and go over where we're at with everybody. . . . I'll peg him and Savino to come into the city with us so we can go down to a steakhouse, have a conversation in the round." Gov't Ex. 216-T at 1–2. Raj asked Halloran to find out "what's it gonna take" for the county chairs to back Smith. *Id*. at 6.

On December 19, Halloran introduced Stern and Raj to Eaton. Eaton expressed reservations about supporting Smith, worrying about a "not for profit that he formed" to "raise[] money for Katrina": "Nobody knows where the money went." Gov't Ex. 113-T at 4. Eaton also explained that he was hoping for the five county chairs to unite behind a single candidate. After Eaton left, Halloran remained optimistic that Eaton could be persuaded, explaining: "His concern is that the housekeeping fund in Brooklyn gets a donation. That's gonna make things work you know, twenty-five, thirty-five, forty-five . . . ." *Id*. at 26.

11

Halloran further stated that Eaton needed assurances from Smith concerning Republican appointments: "He doesn't need to get fed but he knows he got to feed the Party." *Id*. "The only issue now that's holding him up is this fucking not-for-profit situation. If you clear that up, he's yours." *Id*. at 29. Halloran then brought up Tabone, the de facto leader of the Queens Republican Party, and volunteered that "he's open for business. . . . He is, let me tell you something he's [a] fucking whore, there's no nice way to say it, alright, it's all about the bottom line for him. . . . [Y]ou can buy him off tomorrow." *Id*. at 31. Halloran speculated that if Tabone and Savino backed Smith, Eaton would be more comfortable doing so as well.

Halloran arranged for Raj and Stern to meet with Tabone and Savino in January and February. During that period, he advised Raj and Stern on how to discuss the scheme with the county chairs, suggesting that legal retainers be used as "a cover" for the bribes. Gov't Ex. 120-T at 2. He reassured them that he could "deliver" and that it was "just a matter of . . . the number." *Id*. at 8. On February 8, Halloran met with Raj and Stern to debrief them on his discussions with the chairs. He announced that "we will now probably get all five to give to the Wilson-Pakula." Gov't Ex. 121-T at 1. Savino would require "twenty-five in an

12

envelope," and Tabone requested "twenty-five up front, twenty-five when the Wilson-Pakula is delivered." *Id*. at 2. Dan Isaacs, the Manhattan chair, "is gonna be twenty-five . . . and Malcolm's commitment that once he's on a ballot he's helping out the Queens/Manhattan GOP more than, you know, anybody else." *Id*. at 3. Once those three votes were secured, Eaton and the Staten Island chair would fall into line for free, although Halloran recommended "still taking care of Eaton in other ways." *Id*. at 2. Two days later, Halloran, Raj and Stern gave Smith the good news. At the same meeting, Raj gave Halloran $400 or $500 as an advance on a $75,000 fee for brokering the bribes.

In the afternoon of February 14, Raj, Stern and Halloran met Savino and Isaacs at a midtown steakhouse. After speaking at a table for a few minutes, Raj and Savino left the restaurant to go to Raj's car, which was parked outside. Inside the car, Raj gave Savino $15,000 in cash, and the two discussed having Savino send Raj a retainer agreement as a pretext for the payment. The two returned to the restaurant, and Raj then went back to the car with Isaacs. Their conversation did not go as planned, however: Isaacs originally agreed for Raj to "hire" him for $15,000, Gov't Ex. 129-T at 13, with another $15,000 promised after

13

the Wilson-Pakula was issued, but then backed out, explaining that he would back Smith anyway "because that's where we were inclined to go." *Id*. at 16.

Meanwhile, back in the restaurant, Stern mused to Halloran, "we just bought a [R]epublican candidate. If you think about it." Gov't Ex. 131-T at 1. Halloran agreed: "It's scary." *Id*. Tabone then arrived, and after a lengthy discussion with Halloran, Stern and Raj, accompanied Raj to the restaurant bar, where Tabone patted Raj down to make sure he was not wearing a wire. Raj then offered "twenty now, twenty later," and Tabone responded, "I was thinking twenty-five now, twenty[-]five later," Gov't Ex. 138-T at 12, as Halloran had predicted. The two planned to disguise the payment as a retainer billed to 2Holdings. They then went to the car, where Raj paid Tabone $25,000. The next day, Raj met Halloran again and gave him another $15,000 in cash towards his $75,000 fee.

While Raj was gone with Tabone, Halloran worried to Stern that Raj had "pushed too hard with Isaacs," and that Isaacs had gotten "spooked." Gov't Ex. 140-T at 1. Raj "was getting way too specific. And, you know, look we gotta be vague about this." *Id*. The day after the events at the steakhouse, both Halloran and Raj texted Isaacs to try to set up a meeting with him at which Raj could give

14

him his "retainer."  Gov't Ex. 322-A at 3.  Isaacs was evasive.  Savino also left Isaacs a phone message, and Tabone stopped by Isaacs's office for a brief "awkward" conversation; at trial, Isaacs described Tabone's demeanor as "a little bit squirrely . . . a little fidgety."  Tr. 2026.  Halloran believed that Tabone's intervention had "[s]traightened it all out."  Gov't Ex. 144-T at 1.  His confidence was misplaced: on the evening of February 14, after meeting the conspirators at the steakhouse, Isaacs had had dinner with John Catsimatidis, a Republican billionaire who was also planning to run for mayor and to whom Isaacs and Tabone were close.  Isaacs told Catsimatidis that Halloran had tried to bribe him and asked Catsimatidis to contact law enforcement.  By the next day, state and federal authorities had been apprised of the situation.  By March 20, Halloran had found out about Isaacs's meeting with Catsimatidis and worried that he would be "making phone calls to Cy Vance," the Manhattan District Attorney.  Gov't Ex. 145-T at 5.  On April 2, Halloran, Smith, Savino and Tabone were arrested.

## III.    Procedural History

Trial against Halloran, Smith and Tabone began on June 3, 2014.  On June 10, on Smith's motion, the district court ordered the government to produce "forthwith" any recordings made from a wiretap of Stern's cell phone "that

15

might relate to this case" (the "Stern Calls").  Tr. 754, 761.  After the government produced the Stern Calls, all three defendants moved for dismissal of the indictment, arguing that the failure to produce them earlier constituted a violation of their rights under *Brady v. Maryland*, 373 U.S. 83 (1963).  The district court denied those motions on June 16, declining to decide whether there had in fact been a *Brady* violation and noting that in any event other "less severe" sanctions than dismissal of the indictment were available.  Tr. 1196.  The next day, Smith and Tabone moved for a mistrial, on the basis that the delay resulting from the need to review the Stern Calls would create scheduling conflicts and might cause the jury to feel "rushed or compelled" during its deliberations.  Tr. 1208.  The district court granted those motions.  Halloran opposed a mistrial, and instead elected to proceed with the trial as the sole defendant, following a weeklong continuance.

On July 29, the jury found Halloran guilty on all five counts with which he was charged, and on March 4, 2015, the district court sentenced Halloran principally to 120 months' imprisonment.  This appeal followed.

16

## DISCUSSION

## I.     The Discretionary Funds Scheme Convictions

Halloran challenges the sufficiency of the evidence supporting his convictions on Counts Five and Six of the indictment, which related to the Discretionary Funds Scheme and charged Halloran with committing wire fraud and violating the Travel Act, respectively.  When a defendant challenges the factual sufficiency of the government's case, "the standard of review is exceedingly deferential."  *United States v. Binday*, 804 F.3d 558, 572 (2d Cir. 2015). "We analyze the sufficiency of the evidence in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence, and will uphold the conviction if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id*. (internal quotation marks omitted).

Halloran argues that there was insufficient evidence to support a finding that he acted with the requisite intent.  The "scheme to defraud" element of wire fraud requires "the specific intent to harm or defraud the victims of the scheme,"

17

*United States v. Walker*, 191 F.3d 326, 334 (2d Cir. 1999)[2] – in this case, New York City.  Similarly, the New York bribery statutes undergirding the Discretionary Funds Scheme Travel Act conviction require "an agreement or understanding that [the defendant's] vote, opinion, judgment, action, decision or exercise of discretion as a public servant will . . . be influenced" by the bribe.  N.Y. Penal Law §§ 200.10, 200.11.

According to Halloran, he never intended to disburse his member items to Raj and Stern, and instead planned to take their bribes without ever following through on his promises to them.  He testified at trial that his strategy was to "yes [Raj] to death," Tr. 2988, in order to find out "whether Mr. Stern is playing me or whether Raj is playing him," Tr. 3027 – "whether or not there's anybody behind the curtain."  *Id*.  There was sufficient evidence at trial for a reasonable juror to determine otherwise, however.  The jury was entitled to believe that Halloran was telling the truth when he repeatedly assured Raj and Stern that he would help them get discretionary funding, and was not telling the truth at trial when he asserted that those assurances were lies.  The assurances were

---

[2] Although *Walker* involved mail fraud, rather than wire fraud, the intent element is the same for both offenses.  *See United States v. Carlo*, 507 F.3d 799, 801 & n.1 (2d Cir. 2007).

18

corroborated by the two letters on official City Council letterhead ostensibly committing Halloran's office to funding the scheme. Further, the jury could have concluded that Halloran's continued dealings with Raj and Stern throughout late 2013 and early 2014, in the context of the Wilson-Pakula Scheme, indicated that he trusted them and belied the notion that he was simply playing along to find out more about their intentions.

In response, Halloran emphasizes the lack of evidence that he took any steps to arrange for the payment of city funds to Raj and Stern during the nearly five-month period between the date of his letter to 2Holdings and the date of his arrest.[3] Halloran's office manager, Chrissy Voskerichian, testified that discretionary funding was awarded once a year; that "fiscal year 2013," the year

---

[3] Relying on our summary order in *United States v. Abdallah*, 528 F. App'x 79 (2d Cir. 2013), Halloran argues that the government was required to prove that such steps were taken. He is mistaken. The relevant portion of *Abdallah* concerned a conviction for *attempted* securities fraud, *id*. at 82, and an element of attempt liability is "conduct amounting to a substantial step towards [the] commission" of the object crime. *United States v. Desposito*, 704 F.3d 221, 230 (2d Cir. 2013). By contrast, Halloran was convicted of wire fraud and of violating the Travel Act, not of attempting those offenses. "Unlike the crime of attempt, the Travel Act does not require that the government establish that the accused took a substantial step in furtherance of the intended unlawful activity." *United States v. Jenkins*, 943 F.2d 167, 173 (2d Cir. 1991). The same is true of wire fraud. *Cf. United States v. Ramirez*, 420 F.3d 134, 144–45 (2d Cir. 2005) (explaining that misuse of the mails, and not the "scheme to defraud," is the conduct element of mail fraud).

referred to in Halloran's October 23 letter, had already been "closed out" at the time the letter was written, App'x 699; and that, at the time of his arrest, Halloran had not yet submitted his allocation of discretionary funding for fiscal year 2014. Ramon Martinez, the First Deputy Chief of Staff to the City Council Speaker, testified that the deadline for Council members to submit their selections for discretionary funding to the Council was April 16, 2013, a mere two weeks after Halloran was arrested. But these same witnesses also explained that it was not too late for Halloran to follow through on his promises at the time he was arrested. Martinez testified that Halloran could have used a "transparency resolution" to redirect funds that had been allocated to other groups for fiscal year 2013. App'x 754–55. And Voskerichian testified that Halloran, whose ability to allocate money was revoked after his arrest, could otherwise have made changes to his member item allotments until the Council passed the budget, in late June.

As further proof that he never intended to help Raj and Stern get discretionary funding, Halloran relies on testimony by witnesses from the three nonprofits to which the October 23 letter was addressed. These three witnesses all claimed never to have received the letter and never to have heard of

20

2Holdings. But the jury was entitled to disbelieve that testimony, especially given that it came from the leaders of organizations that the jury had heard Halloran refer to as "my groups." Gov't Ex. 109-T at 7. Halloran also points to testimony by Paul Custer, a senior vice-president at the YMCA of Greater New York, that the Bayside YMCA building was sold to a limited liability company in August 2012 – before Halloran had ever met Raj – and that Custer's office had contacted Halloran's about the sale of the property in September 2011 but that Halloran had expressed no interest in having the City buy it. But Custer also conceded that Halloran could have contacted the real estate brokerage firm that handled the sale without his knowledge, and that in any event it would have remained possible for Halloran to have the City buy the building from the limited liability company after the YMCA sold it.

In short, Halloran has not identified any evidence that conclusively rebuts the most natural inference to be drawn from his dealings with Raj and Stern: that he intended to arrange for them to obtain discretionary funding. Because the evidence adequately supported that inference, and because the jury was entitled to disbelieve evidence to the contrary, Halloran's sufficiency challenge fails.

## II. The Wilson-Pakula Scheme Travel Act Conviction

Next, Halloran challenges his conviction on Count Three of the indictment, which charged him with violating the Travel Act by participating in the Wilson-Pakula Scheme. The Travel Act, in relevant part, prohibits "travel[ing] in interstate or foreign commerce or us[ing] the mail or any facility in interstate or foreign commerce, with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity." 18 U.S.C. § 1952(a)(3). "Unlawful activity," in turn, is defined to include "bribery . . . in violation of the laws of the State in which committed or of the United States." *Id*. § 1952(b). In other words, a Travel Act conviction based on bribery requires an underlying violation of a federal or state bribery statute.

The indictment charged that the statutes violated by Halloran were §§ 200.45 and 200.50 of the New York Penal Law, entitled "Bribe giving for public office" and "Bribe receiving for public office," respectively. The first prohibits "confer[ring], or offer[ing] or agree[ing] to confer, any money or other property upon a public servant or a party officer upon an agreement or understanding that some person will or may be appointed to a public office or designated or nominated as a candidate for public office." N.Y. Penal Law § 200.45. The

22

second prohibits "[a] public servant or a party officer" from "solicit[ing], accept[ing] or agree[ing] to accept any money or other property from another person" upon that same agreement or understanding. N.Y. Penal Law § 200.50. Halloran contends, however, that §§ 200.45 and 200.50 do not reach bribes paid to secure a Wilson-Pakula for the bribe payer. A Wilson-Pakula, he explains, does not amount to a "designat[ion] or nominat[ion] as a candidate for public office," but merely gives a person the right to compete for such a nomination. Thus, he concludes, the bribes paid and received in connection with the Wilson-Pakula scheme were not supported by the "agreement or understanding" necessary for a violation of § 200.45 or § 200.50.

We disagree. Both statutes speak in terms of "an agreement or understanding that some person will *or may be* . . . designated or nominated as a candidate for public office" (emphasis added). The words "may be" serve to extend the reach of the statutes beyond situations in which the bribe taker has the power unilaterally to ensure the designation or nomination of the candidate. In this context, "may" is naturally read to connote either possibility (as in: "Sea levels may rise by several feet in the next hundred years.") or permission (as in: "You may leave the table only after you have finished your vegetables."). *See*

23

Oxford English Dictionary (3d ed. online version Mar. 2016) (defining "may," at sense 5, as "[e]xpressing objective possibility, opportunity, or absence of prohibitive conditions," and, at sense 6a, as "[e]xpressing permission or sanction: be allowed (to do something) by authority, law, rule, morality, reason, etc.").  An agreement or understanding that a Wilson-Pakula will be issued to a person is an agreement or understanding that that person "may be . . . designated or nominated as a candidate for public office," under either of those meanings of "may": the Wilson-Pakula not only makes it *possible* that the person will be designated or nominated as the candidate of a party, but it does so by *permitting* the person to compete for the nomination.

Halloran reads §§ 200.45 and 200.50 as using "may" in a third sense, connoting purpose (as in: "Open the blinds, so that the sun may shine in.").  *See id*. (noting, at sense 9, that "may" can be "[u]sed in subordinate clauses involving the idea of purpose or contemplated result").  Halloran's argument, presumably, is that a party officer could agree to help issue a Wilson-Pakula to a candidate without having the purpose to help that candidate win the party nomination – the officer's real purpose, for instance, could be simply to harm the chances of one of the other candidates.  That reading seems to us, in the context of a statute

24

that juxtaposes "will" with "may be," considerably less plausible than the "possibility" or "permission" readings. Reading "may" only as a word of purpose effectively renders "may be" redundant. The words "an agreement or understanding that some person will . . . be . . . designated or nominated as a candidate" already convey that the "designat[ion] or nominat[ion]" is the purpose of the bribe. A purpose-connoting "may" would add nothing to what the statutes already prohibit, and because "we must give effect to every word of a statute wherever possible," *Leocal v. Ashcroft*, 543 U.S. 1, 12 (2004), we cannot read "may" in the way Halloran urges.

Halloran's attempts to find an independent meaning for "may" that does not connote possibility or permission are unpersuasive. He asks us to consider a hypothetical in which the appointment of a public official requires the approval of a majority of a five-member board. If a person seeking the appointment bribes each board member, the *purpose* of each bribe may be to obtain the appointment, but only the bribe that secures a favorable majority guarantees that the person "will" be appointed. Halloran claims that "the word 'may' in the statute ensures that [the bribe payer] can still be prosecuted even if he is caught before he has paid the third bribe or if only a minority of board members accept his payments."

25

Appellant's Br. 23. Thus, he concludes, "'will' includes only successful schemes while 'may' takes in unsuccessful ones." Reply Br. 5. But Halloran misreads the statutes by ignoring the fact that the words "will" and "may" help to describe an "agreement or understanding," the nature of which, at the time when it is reached, cannot depend on whether the agreed-upon scheme turns out to be successful at some point in the future. *Cf.* N.Y. Penal Law § 200.15(2) ("It is no defense to a prosecution pursuant to the provisions of this article that the public servant did not have power or authority to perform the act or omission for which the alleged bribe . . . was given."). The distinction between "will" and "may" must thus have some significance at the earlier point in time when the scheme is devised. In the context of Halloran's hypothetical, the "possibility" meaning of "may" supplies such a distinction, because each board member cannot alone guarantee that the chosen candidate "will" be appointed, and can instead pledge only his vote – an official act that mathematically increases the possibility that the candidate will be appointed.

Finding no support for Halloran in the text of the statutes, we turn next to the case law. Because there are very few court decisions interpreting §§ 200.45

26

and 200.50,[4] which were enacted in 1965 as part of a comprehensive revision of the New York Penal Law, Halloran relies instead on cases construing what he claims are predecessors to those statutes. In support of the continued relevance of those cases, he cites *People v. Bac Tran*, 80 N.Y.2d 170 (1992), in which the New York Court of Appeals construed New York's basic bribery statute, N.Y. Penal Law § 200.00, which was also a product of the 1965 revision. The court noted that while § 200.00 (like §§ 200.45 and 200.50) uses the words "agreement or understanding," predecessor statutes used the words "with intent to influence" or similarly "kept the focus on the mental state of the bribe maker." *Bac Tran*, 80 N.Y.2d at 175–76. It then quoted the legislative history of the 1965 revision as stating that "there was no intent [for the revision] to make 'major substantive changes in existing law.'" *Id*. at 175. Halloran concludes from this statement that we should read case law interpreting the pre-1965 statutes as bearing directly on the statutes as they exist today. But that conclusion is undermined by the rest of the very same paragraph of *Bac Tran*, in which the court determined that,

---

[4] The only such case cited by either party is *Eisert v. Town of Hempstead*, 918 F. Supp. 601 (E.D.N.Y. 1996), which the government contends supports its position, and which Halloran attempts to distinguish. We need not determine which party's reading of *Eisert* is most compelling, because we find Halloran's arguments unpersuasive on other grounds.

27

notwithstanding the quoted legislative history, the words "agreement or understanding" "signaled a new and different notion," and that the use of those words constituted "a substantive change" that must be given effect. *Id*. at 176. *Bac Tran* thus in fact stands for the proposition that case law on the pre-1965 statutes remains relevant only to the extent that the 1965 revision made no "substantive change" to the language that those cases construed.

*People v. Burke*, 371 N.Y.S.2d 63 (Sup. Ct., N.Y. Cty. 1975), illustrates the point. In that case, the defendant solicited a bribe by offering to cause one candidate to withdraw from a primary election, leaving the other candidate for the nomination unopposed. The court held that that conduct did not violate former § 448(3) of the New York Election Law, because the withdrawal would not "procure" or "cause" the nomination of the remaining candidate: it "could not prevent the possible designation of another candidate by petition or by 'write-in' petition [or] the filling of the vacancy by the committee on vacancies." *Id*. at 65. But that holding was firmly grounded in the text of former § 448(3), which prohibited (in relevant part) "[m]ak[ing], tender[ing] or offer[ing] to procure, or caus[ing] any nomination or appointment for any public office or place . . . upon the payment or contribution of any valuable consideration, or

28

upon an understanding or promise thereof." N.Y. Elec. Law § 448(3) (McKinney Supp. 1975). The court in *Burke* explained that the conduct reached by former § 448(3) was "an offer to 'procure' or 'cause' a nomination," and that while obtaining the withdrawal of a candidate "may well have affected the outcome of the contest," it was "not what the statute prohibits." *Burke*, 371 N.Y.S.2d at 66. A similar conclusion does not hold for §§ 200.45 and 200.50, in which, as explained, the words "may be" show that the statutes reach bribery schemes in which the bribe taker does not alone have the power to "procure" or "cause" a nomination.[5]

Halloran also relies on *People v. Cunningham*, 390 N.Y.S.2d 547 (Sup. Ct., Bronx Cty. 1976), another case under former § 448(3), in which the defendant

---

[5] Halloran's reliance on *Burke* is misplaced for the additional reason that former § 448(3) remained in effect in 1975 and was thus not one of the statutes affected by the 1965 revision of the Penal Law. It is true that in *People v. Cunningham*, 390 N.Y.S.2d 547 (Sup. Ct., Bronx Cty. 1976), the court noted that former § 448(3) covered "the same area of activity" as § 200.45 and expressed doubts that the legislature would have intended "that significantly different consequences might follow from the application of the two sections." *Id*. at 554. But *Cunningham*'s doubts carry less weight in light of the fact that former § 448(3) has survived in substantially unaltered form to this day, and was recently moved to the very article of the Penal Law where §§ 200.45 and 200.50 are found. *See* 2014 N.Y. Laws 110 (repealing former § 448 – by then renumbered § 17-158, *see* 1976 N.Y. Laws 1, 194 – and replacing it with a new § 200.56 of the Penal Law). The legislature's decision to retain former § 448 and to codify it alongside §§ 200.45 and 200.50 suggests instead that the statutes all differ at least somewhat in the conduct they prohibit.

29

agreed to support his co-defendant for the Democratic nomination for Judge of the Civil Court, in return for the co-defendant's promise to resign his position as member of the City Council at a politically convenient time for the Democrats. *Id*. at 553. The question was whether the promised resignation constituted "payment or contribution of any valuable consideration" under the statute. *Id*. at 554. The court held that it did not, because the statute contemplated only "a material benefit." *Id*. In so concluding, the court noted "the striking historical fact that in the nearly 100 years that have elapsed since [former § 448(3)] was enacted there appears to have been not a single instance in which anyone was ever indicted in connection with such a resignation." *Id*. at 555. That fact was all the more noteworthy given that "such resignations ha[d] . . . occurred on innumerable occasions involving a broad range of public officials of both political parties, both judicial and non-judicial, often accompanied by adverse public comment." *Id*. "[S]urely the settled judgment of prosecutors over so long a period of time," the court stated, "is entitled to some weight." *Id*. Halloran similarly urges us to take note of the apparent absence of prosecutions under §§ 200.45 and 200.50 arising out of schemes to buy Wilson-Pakulas, and to conclude that those schemes are not prohibited. But unlike the court in

30

*Cunningham*, we have no basis for believing that this absence of prosecutions is the result of the "settled judgment of prosecutors," rather than the rarity of such schemes or their relative undetectability. The fact that this may be the first time that a scheme to buy a Wilson-Pakula is charged under §§ 200.45 and 200.50 is of no moment without evidence that prosecutors affirmatively declined to prosecute similar schemes in the past.

Further, we note that *Cunningham* in fact undermines Halloran's position in a different respect. The defendant in that case claimed, in an argument that parallels Halloran's, that he could not alone "cause" the nomination of his co-defendant within the meaning of former § 448(3), given that the nominee would ultimately be chosen in a primary election. *Id.* at 554. The court in *Cunningham*, taking what was arguably a stance contrary to *Burke*, disagreed, explaining that "to accept the interpretation urged by the defendants would leave so wide a gap in the intended statutory protection against corrupt practices in nominations for public office that it could be adopted only if there were no reasonable alternative." *Id.* Thus, insofar as the case law on former § 448(3) is at all relevant for our purposes, taken as a whole it provides Halloran with minimal support.

Halloran invites us to dive even deeper into the history of New York's bribery and public corruption laws, by citing two cases decided over a century ago, *Deyoe v. Woodworth*, 144 N.Y. 448 (1895), and *People v. Willett*, 213 N.Y. 368 (1915). Those decisions, he claims, show that the statutes then in effect were concerned with the buying and selling of nominations themselves, rather than with "preparatory step[s]," Appellant's Br. 28, or "eligibility criteri[a]," *id*. at 29. We do not find this especially instructive. Neither case discusses such preparatory steps or eligibility criteria at all, let alone holds that the statutes at issue did not reach them. But more importantly, as Halloran recognizes, *Deyoe* and *Willett* were decided in an era that predates modern primary elections, let alone Wilson-Pakulas. We are aware of no authority for the unlikely proposition that §§ 200.45 and 200.50 were intended to reach bribery only in connection with candidate-selection procedures already prevalent in the early twentieth century.

Finally, Halloran raises the specter that a reading of §§ 200.45 and 200.50 in which the word "may" connotes possibility, rather than purpose, would prohibit paying for many political activities that are commonly compensated, such as appearing in a political advertisement, carrying petitions, or canvassing voters, on the basis that those activities are meant to increase the possibility that a

32

candidate will be nominated. That has constitutional implications, Halloran argues, because "[a] statute that reaches 'a substantial amount of innocent conduct' confers an impermissible degree of discretion on law enforcement authorities to determine who is subject to the law." *Arriaga v. Mukasey*, 521 F.3d 219, 228 (2d Cir. 2008), quoting *City of Chicago v. Morales*, 527 U.S. 41, 60–61 (1999).

But the activities Halloran lists are readily distinguishable from the situation before us. Unlike Wilson-Pakulas, endorsements and advertisements are not statutory conditions of eligibility for nomination; and while gathering the required number of signatures on a designating petition *is* such a condition, *see* N.Y. Elec. Law §§ 6-118, 6-136, that condition is fulfilled by the voters who sign the petition, not by the party officer who circulates it. Put another way, none of Halloran's examples involve an exercise of statutory authority: only a party committee can issue a Wilson-Pakula, whereas anyone can carry a petition,[6]

---

[6] Subject to the caveat that every designating petition must also be signed by a witness who is a notary public, a commissioner of deeds, or a duly qualified voter of the state of New York who is an enrolled member of the relevant political party, N.Y. Elec. Law § 6-132(2), (3), which means that in practice only those people circulate petitions. But one is not required by statute to be a party officer or hold any other official position to do so.

solicit votes, appear in an advertisement, or offer an endorsement (although, of course, a party officer's endorsement will often be more valuable than that of the average voter). The New York Court of Appeals has explained that article 200 of the Penal Law was enacted "to help prevent and prosecute abuses of power in government." *People v. Garson*, 6 N.Y.3d 604, 611 (2006). But to abuse power, one must first use it; when a party officer endorses a candidate, he may be leveraging the influence conferred by his position, but he is not acting in an official capacity or otherwise directly affecting the course of governmental action. We are satisfied that, by contrast, accepting bribes in exchange for an exercise of statutory authority that renders the bribe payer eligible to be nominated falls squarely within the category of abuses of power that the New York legislature was concerned with preventing.

In sum, §§ 200.45 and 200.50 prohibit the conduct constituting the Wilson-Pakula Scheme under any plausible reading of those statutes, and neither the case law nor Halloran's constitutional concerns persuade us otherwise.[7]

---

[7] Nor does Halloran's invocation of the rule of lenity, which comes into play when "ordinary tools of legislative construction fail to establish that the Government's position is unambiguously correct." *United States v. Valle*, 807 F.3d 508, 526 (2d Cir. 2015).

Accordingly, we reject Halloran's challenge to his conviction on Count Three.[8]

## III.  The Wilson-Pakula Scheme Honest-Services Fraud Conviction

Count Two of the indictment charged Halloran with committing wire fraud under an honest-services fraud theory in connection with the Wilson-Pakula Scheme.  A person commits wire fraud when, "having devised or intending to devise any scheme or artifice to defraud," he uses interstate wires "for the purpose of executing such scheme or artifice."  18 U.S.C. § 1343.  Section 1346, the honest-services fraud statute, defines the term "scheme or artifice to defraud" to include "a scheme or artifice to deprive another of the intangible right of honest services," *id*. § 1346, which the Supreme Court in turn has held to encompass "only bribery and kickback schemes."  *Skilling v. United States*, 561 U.S. 358, 368 (2010).

Halloran does not dispute that the Wilson-Pakula Scheme falls into the category of "bribery and kickback schemes" prohibited by § 1346 under *Skilling*. Instead, he focuses on another element of honest-services fraud mentioned in

---

[8] Because we believe that our reading of the statutes is dictated by their text and history, and because Halloran cites no persuasive authority casting significant doubt on that reading, we see no reason to certify questions about the meaning of the statutes to the New York Court of Appeals, and deny Halloran's motion asking us to do so.

passing in *Skilling*: a violation of a fiduciary duty. *See Skilling*, 561 U.S. at 407 (describing the "solid core" of the honest-services doctrine as involving "offenders who, in violation of a fiduciary duty, participated in bribery or kickback schemes"). Concurring in the judgment in *Skilling*, Justice Scalia emphasized the lingering ambiguities in § 1346, pointing out that "the nature and content of the fiduciary duty central to the 'fraud' offense" remained undefined, and that even "the *source* of the fiduciary obligation – whether it must be positive state or federal law, or merely general principles, such as the obligations of loyalty and fidelity that inhere in the employment relationship" – was unclear. *Id*. at 417 (Scalia, *J*., concurring in the judgment) (internal quotation marks and citations omitted) (emphasis in original); *see also United States v. Rybicki*, 354 F.3d 124, 163 (2d Cir. 2003) (en banc) (Jacobs, *J*., dissenting) (noting the majority's failure to define the type of duty that must be breached to violate § 1346, or to decide whether the source of the duty was state or federal law).

Seizing upon these uncertainties, Halloran asserts that § 1346 is unconstitutionally vague as applied to the Wilson-Pakula conduct. "The void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what

36

conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." *United States v. Rosen*, 716 F.3d 691, 699 (2d Cir. 2013) (alteration omitted). "The doctrine addresses concerns about (1) fair notice and (2) arbitrary and discriminatory prosecutions." *Id*. (internal quotation marks omitted). Under the "fair notice" prong, a court must determine "whether the statute, either standing alone or as construed, made it reasonably clear at the relevant time that the defendant's conduct was criminal." *Id*.

Halloran argues that § 1346 fails the "fair notice" prong because it does not make clear whether the Republican county chairs were under a cognizable fiduciary duty to their party not to accept payments in exchange for approving Wilson-Pakulas. Halloran suggests that the answer to that question may differ depending on whether federal or New York law is controlling. We are not persuaded. In all respects relevant to the Wilson-Pakula conduct,[9] there is no meaningful difference between the federal and New York law standards for determining whether a fiduciary duty exists. In New York, "a fiduciary

---

[9] Because Halloran brings an "as-applied" vagueness challenge, the challenge must fail if Halloran's own conduct is clearly proscribed by § 1346, whatever ambiguities in the statute's scope may otherwise exist. *See Holder v. Humanitarian Law Project*, 561 U.S. 1, 18–19 (2010).

relationship arises between two persons when one of them is under a duty to act for or to give advice for the benefit of another upon matters within the scope of the relation." *Oddo Asset Mgmt. v. Barclays Bank PLC*, 19 N.Y.3d 584, 592–93 (2012) (internal quotation marks omitted). "Essential elements of a fiduciary relation are reliance, de facto control and dominance." *AG Capital Funding Partners, L.P. v. State St. Bank & Trust Co.*, 11 N.Y.3d 146, 158 (2008) (internal quotation marks and alterations omitted). Similarly, the Ninth Circuit, in a case under § 1346, has explained: "A fiduciary is generally defined as 'a person who is required to act for the benefit of another person on all matters within the scope of their relationship.'" *United States v. Milovanovic*, 678 F.3d 713, 722 (9th Cir. 2012) (en banc) (alteration omitted), quoting Black's Law Dictionary (9th ed. 2009). And we have said, in a case involving federal securities law, that "[a]t the heart of the fiduciary relationship lies reliance, and de facto control and dominance." *United States v. Chestman*, 947 F.2d 551, 568 (2d Cir. 1991) (internal quotation marks omitted); *see also United States v. Szur*, 289 F.3d 200, 210 (2d Cir. 2002) (approving of jury instructions tracking the language in *Chestman* in a case under

§ 1346).[10]

Halloran offers two reasons why the county chairs may have breached a fiduciary duty under federal law but not under New York law, neither of which is persuasive.[11] First, he suggests that New York law does not impose fiduciary duties upon unpaid volunteers.[12] But he cites no case law so holding, and there are intimations to the contrary in New York cases. *See Schneiderman ex rel. People v. Lower Esopus River Watch, Inc.*, 975 N.Y.S.2d 369, *20 (Table) (Sup. Ct., Ulster Cty. 2013) ("Fiduciary duties arise regardless of whether the party in whom trust is reposed is a volunteer or is compensated."); *cf. Roslyn Union Free Sch. Dist. v. Barkan*, 16 N.Y.3d 643, 648, 653 (2011) (holding that several claims, including one

---

[10] Indeed, the district court, having concluded, as we do, that there is no meaningful difference between federal and New York law on the question of the existence of a fiduciary duty, gave the jury a single instruction on the issue that reflected both bodies of law, which Halloran does not challenge on appeal.

[11] A third reason given by Halloran requires only cursory analysis. He claims that in New York, fiduciary duties "are defined by specific laws and rules." Reply Br. 15. As we have explained, however, the county chairs' duty not to accept the Wilson-Pakula bribes overlapped with their duty under N.Y. Penal Law § 200.50 not to accept bribes for public office. Thus, whether or not Halloran's understanding of New York law is correct, this argument draws no relevant distinction between federal and New York law.

[12] Halloran cites no record evidence that county party chairs are uncompensated, but, as the government does not dispute his assertion, we assume for purposes of this opinion that it is so.

for breach of fiduciary duty, against a volunteer school board member were timely, without addressing the merits of the claims); *Strax v. Murray Hill Mews Owners Corp.*, 809 N.Y.S.2d 759, 761 (App. Term 1st Dep't 2005) (affirming the trial court's finding that the plaintiff had "gratuitously" rendered brokerage services "in furtherance of her fiduciary duties as a director" of a cooperative apartment corporation).

Second, citing only a nonprecedential trial court decision, Halloran claims that under New York law the county chairs did not violate a fiduciary duty to the Republican Party because they did not "injure or act contrary to the interests" of the party, *Vione v. Tewell*, 820 N.Y.S.2d 682, 686 (Sup. Ct., N.Y. Cty. 2006), and instead *furthered* those interests by adding to the choices available to Republican voters in the primary election. That argument contradicts the legislative conclusion expressed by the Wilson-Pakula Law. The New York Court of Appeals has stated that the purpose of the law "was to prevent the invasion or takeover of the party by outsiders." *Master v. Pohanka*, 10 N.Y.3d 620, 626 (2008). That purpose implies that the party committees to which the legislature has given authority over Wilson-Pakulas will act as gate-keepers, using independent judgment, and not indiscriminately issue Wilson-Pakulas upon request (or to the

40

highest bidder). We have no basis for ignoring the legislature's judgment and accepting Halloran's contention that political parties instead benefit from an open-door policy when it comes to candidates for the party's nomination.

Halloran's next argument is less a vagueness argument than a direct attack on the sufficiency of the evidence supporting his conviction on Count Two. The Wilson-Pakula Law, he points out, entrusts the issuance of Wilson-Pakulas to candidates for New York citywide office to "a majority vote of those present at a joint meeting of the executive committees of each of the county committees of the party within the city of New York," N.Y. Elec. Law § 6-120(3), and not to the county chairs themselves. How could the chairs have a fiduciary duty not to accept bribes in exchange for Wilson-Pakulas, Halloran asks, when they did not have the authority to act on behalf of the party by issuing Wilson-Pakulas in the first place?

The argument fails, however, because the existence of a fiduciary duty depends not on formal authority but on "de facto control." *AG Capital*, 11 N.Y.3d at 158; *Chestman*, 947 F.2d at 568. The chairs may not have had de jure power under § 6-120(3) to make final decisions on Wilson-Pakulas, but as long as the party committees in fact followed the chairs' lead with respect to those decisions,

41

no legal principle bars a jury finding that the chairs owed a fiduciary duty not to support the issuance of a Wilson-Pakula unless (in their judgment) it was in the best interests of the party. The existence of a fiduciary duty is a question of fact for the jury, *Milovanovic*, 678 F.3d at 723, and as such (as we have explained) it is subject to an "exceedingly deferential" standard of review. *Binday*, 804 F.3d at 572. The jury heard testimony from Savino that, as chair, he understood his duty to be to act in the best interests of the Bronx Republican Party, and that the party "relied on [him] and [his] suggestions as to how they would proceed, what they would vote on, who they would support, who they wouldn't support." Tr. 1824. Similarly, Isaacs testified that he was "supposed to promote" the interests of the members of the Republican Party, Tr. 1972, that party members relied on him to make decisions on their behalf, and that he exercised control over the party committee and its affairs. This unrebutted testimony is corroborated by the recordings introduced at trial, in which all of the conspirators appear to act on the assumption that all that is needed to obtain a Wilson-Pakula is the backing of three of the county chairs. The evidence was thus sufficient to support a finding that the county chairs had de facto control over, and thus fiduciary duties to their party with respect to, Wilson-Pakulas.

Finally, Halloran seeks refuge in the First Amendment, arguing that the Supreme Court in *Citizens United v. Federal Election Commission*, 558 U.S. 310 (2010), created a "brave new world . . . in which the institutionalized bribery of campaign finance . . . is constitutionally protected," thus "blurring . . . the distinction between protected speech and bribery." Reply Br. 22. "[I]t would exalt form over substance," he adds, "to hold that Halloran's mere failure to arrange for the payments in question to be made through a political action committee converts protected speech to fraud." *Id*. This rhetorical gesture is unsustainable as a legal argument. *Citizens United* invalidated a ban on independent expenditures by corporations and unions for certain types of political speech. 558 U.S. at 365–66. It did not hold that the First Amendment protects bribery – to the contrary, the Court explicitly discussed the government's interest in preventing "*quid pro quo* corruption" or the appearance thereof. *Id*. at 356–57, 359. Quid pro quo corruption – the payment of bribes in exchange for the issuance of a Wilson-Pakula – is the very essence of the Wilson-Pakula Scheme.

For these reasons, we detect no legal error warranting reversal of Halloran's conviction on Count Two.[13]

## IV.    Remaining Arguments

Halloran's remaining arguments, as advanced by counsel or in his pro se submission, require much less discussion.

### A.    Sentencing

Halloran's challenges to the procedural and substantive reasonableness of his sentence are without merit.  First, Halloran argues that the district court committed procedural error by "declining to consider" the two-year sentence imposed upon former Virginia Governor Bob McDonnell in an unrelated bribery case in the Eastern District of Virginia.  Appellant's Br. 64.  We disagree. Although "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"

---

[13] We accordingly deny Halloran's motion that we hold this appeal in abeyance pending the Supreme Court's decision in *McDonnell v. United States*, No. 15-474. *McDonnell* principally presents a quite different issue: the meaning of "official act" in the context of a bribery prosecution under the honest-services statute and the Hobbs Act.  Because there can be no dispute that disbursing public funds and issuing a Wilson-Pakula are official acts, *McDonnell* has no apparent relevance to the issues in this appeal.  To the extent the petitioner in *McDonnell* also argues that the wire fraud honest-services statute is unconstitutionally vague, we are required to follow the Supreme Court's holding in *Skilling*, 561 U.S. at 412–13.

is a factor district courts must consider when imposing sentence, 18 U.S.C.

§ 3553(a)(6), that provision does not require a district court to conform its

sentence to any single other sentence adduced by a defendant.  Halloran further

argues that the district court erred in calculating the loss amount under U.S.S.G.

§ 2B1.1(b)(1).  "Facts in support of a sentencing calculation need only be proven

by a preponderance of the evidence, and the district court's findings will not be

disturbed unless clearly erroneous."  *United States v. Beverly*, 5 F.3d 633, 642 (2d

Cir. 1993).  The district court's determination that Halloran accepted a $7500 cash

bribe on September 7, 2012 was sufficiently supported by trial testimony and by a

recording of the meeting at which the bribe was made.

Second, in reviewing the substantive reasonableness of a sentence, we "will

set aside only those outlier sentences that reflect actual abuse of a district court's

considerable sentencing discretion."  *United States v. Messina*, 806 F.3d 55, 66 (2d

Cir. 2015).  Under that standard, Halloran's 120-month sentence, which was

below the Guidelines range of 151 to 188 months, was reasonable.  *See United

States v. Perez-Frias*, 636 F.3d 39, 43 (2d Cir. 2011) ("It is . . . difficult to find that a

below-Guidelines sentence is unreasonable.").  Halloran's arguments to the

contrary are unavailing.  The Wilson-Pakula Scheme involved the paying of quid

45

pro quo bribes and was thus, contrary to Halloran's contention, not in a "gray area" of the law. Appellant's Br. 67. The district court discussed his service to the community at length, and in fact imposed a below-Guidelines sentence on the basis of that service. And the relative length of Halloran's sentence when compared with those imposed in certain other bribery cases is readily explained by aggravating factors such as Halloran's extensive perjury at trial and the fact that he participated in two separate bribery schemes.

B.      *Brady* **Issues**

Halloran asserts that the government's failure to produce all of the Stern Calls until eight days after the beginning of trial constituted a *Brady* violation requiring dismissal of the indictment. The government's failure to produce evidence is prejudicial and thereby violates a defendant's rights under *Brady* "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Persico*, 645 F.3d 85, 111 (2d Cir. 2011) (internal quotation marks omitted). Further, "as long as a defendant possesses *Brady* evidence in time for its effective use," there can be no *Brady* violation. *United States v. Coppa*, 267 F.3d 132, 144 (2d Cir. 2001).

Halloran has not established a reasonable probability that earlier disclosure of the Stern Calls would have changed the verdict at trial. He argues, on the basis of calls indicating that Stern had other unmonitored phone lines and email accounts, that the government lost control of Stern and allowed him to pursue an agenda of selectively targeting Republican politicians. Such unsubstantiated speculation cannot support a finding that undisclosed evidence is material under *Brady*. *See Riascos-Prado v. United States*, 66 F.3d 30, 33 n.1 (2d Cir. 1995). Another call suggesting that Stern may have given Halloran only $2000, rather than $7500, on September 7, 2012 was not relevant to Halloran's guilt or innocence, but only to the loss calculation for sentencing purposes. And the call in which Halloran's aide explains to Stern the proper procedures for applying for discretionary funding has no bearing on whether Halloran independently accepted bribes in exchange for providing those funds.

Further, when the existence of the Stern Calls came to light, Halloran did not join his co-defendants in moving for a mistrial and instead opted to proceed with the trial following a weeklong continuance. The continuance gave Halloran time to make "effective use" of the calls, *Coppa*, 267 F.3d at 144, as shown by the fact that Halloran's counsel was able to question witnesses about the

47

subject-matter of the calls. Halloran's decision, following the continuance, not to introduce any of the Stern Calls into evidence further indicates that the calls were not material to his defense.[14]

## C. Jurisdictional Elements

Finally, Halloran contends that the government failed to prove the jurisdictional elements of his offenses. We disagree. With respect to wire fraud, the government was required to prove that Halloran either used interstate wires in furtherance of his scheme, or "knew that the use of interstate mail and wire services was a reasonably foreseeable consequence of the scheme." *United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir. 1986). A "wire communication whose origin and ultimate destination are within a single state" can violate the wire fraud statute if it is "routed through another state." *Ideal Steel Supply Corp. v.*

---

[14] Even if Halloran had established a *Brady* violation, dismissal of the indictment would not have been an appropriate remedy. "[T]he remedy for a *Brady* violation is *vacatur* of the judgment of conviction and a new trial in which the defendant now has the *Brady* material available to her." *Poventud v. City of New York*, 750 F.3d 121, 133 (2d Cir. 2014) (en banc). Dismissal of the indictment is an "extreme sanction" and a "drastic remedy," *United States v. Fields*, 592 F.2d 638, 647 (2d Cir. 1978), appropriate only when it is otherwise "impossible to restore a criminal defendant to the position that he would have occupied vis-a-vis the prosecutor," or when there is a "widespread or continuous" pattern of prosecutorial misconduct, *id*. at 648. Neither of those conditions was satisfied here.

*Anza*, 373 F.3d 251, 265 (2d Cir. 2004), *rev'd in part on other grounds*, 547 U.S. 451

(2006). As to the Travel Act, the government was required to prove that Halloran

traveled interstate or used a facility in interstate commerce (e.g., the telephone or

the internet), or caused an agent to do so, with the intent to promote the

underlying unlawful activity – i.e., the bribery. 18 U.S.C. § 1952(a); *United States*

*v. Jenkins*, 943 F.2d 167, 172 (2d Cir. 1991). Purely intrastate use of an interstate

facility is sufficient to violate the Travel Act. *United States v. Nader*, 542 F.3d 713,

722 (9th Cir. 2008); *cf. United States v. Perez*, 414 F.3d 302, 304–05 (2d Cir. 2005)

(construing the identical phrase "facility in interstate commerce" in the federal

murder-for-hire statute to cover wholly intrastate communications made using

such a facility).

Here, the jurisdictional elements of both offenses were sufficiently

supported by evidence that Halloran made phone calls and sent text messages to

Raj while he knew that Raj was out of state, and sent Raj two letters by email in

connection with the Discretionary Funds Scheme; and by evidence that Halloran

caused Smith to send text messages to Raj in connection with the Wilson-Pakula

Scheme that were routed through North Carolina.

Halloran's reliance on *United States v. Archer*, 486 F.2d 670 (2d Cir. 1973), which introduced the concept of "manufactured jurisdiction," *id*. at 682, is misplaced. "Courts have refused to follow *Archer* when there is any link between the federal element and a voluntary, affirmative act of the defendant." *United States v. Wallace*, 85 F.3d 1063, 1066 (2d Cir. 1996). In *Wallace*, that link was established where the defendant purposefully tried to defraud Citibank (a federally insured bank), even though "Citibank was introduced to the scheme only because of the FBI's actions." *Id*. at 1067. Similarly, Halloran took affirmative steps in deciding to text Raj while he was outside New York and in causing Smith to communicate with Raj, even though Raj's interstate travel and the routing of his text messages through North Carolina were the result of the FBI's actions.

## CONCLUSION

We hold that there was sufficient evidence to support a finding that Halloran took part in the Discretionary Funds Scheme with the intent required to sustain his convictions, and that Halloran's Wilson-Pakula Scheme conduct violated both the Travel Act and the honest services fraud statute. We have considered all of Halloran's remaining arguments, and find them without merit. Accordingly, the judgment of the district court is affirmed.